[Civ. No. 18839.   First Dist., Div. One.   Dec. 21, 1960.]

L. CASSELL, Appellant, v. McGUIRE AND HESTER (a Corporation) et al., Respondents.

Raymond H. Levy for Appellant.

Cushing, Cullinan, Hancock & Rothert, Harlow P. Rothert, James P. Shovlin, Jr., and Richard B. Milbye for Respondents.

BRAY, P. J.—Plaintiff appeals from judgments in favor of defendants entered after orders granting motions for nonsuit.

## QUESTIONS PRESENTED

1. Was there substantial evidence which would have supported a verdict in favor of plaintiffs?

2. Alleged error in denying admission (a) of contract between San Francisco and McGuire and Hester and specifications therein referred to; (b) of city ordinances; (c) check for painting prior to excavation.

3. Court's failure to permit jury to inspect premises.

4. Striking portions of defendant's answer.

5. Ultrahazardous activity.

6. Necessity for notice of excavation.

## EVIDENCE

The duty of the reviewing court in a nonsuit appeal is clearly established. We must disregard conflicting evidence and indulge in every legitimate inference in favor of plaintiff, and then determine whether there is any substantial evidence to support a verdict in favor of plaintiff. (*Eigner* v. *Race,* 54 Cal.App.2d 506 [129 P.2d 444]; *Bardin* v. *Case,* 99 Cal.App.2d 137 [221 P.2d 292].)

Defendants contend that plaintiff failed to establish a prima facie case, and particularly that the testimony of Dr. Nickell, the geologist, upon which plaintiff mainly relies, raised merely surmise and conjecture. (See *Eigner* v. *Race, supra,* 54 Cal. App.2d at p. 513, holding that type of evidence insufficient to deny a motion for nonsuit.) We shall principally discuss plaintiff's evidence.

Plaintiff's first amended complaint contains five counts for damages to the four-story apartment building of plaintiff's assignors* at the corner of Parker Avenue and California Street, San Francisco. The first three counts are against McGuire and Hester only; the fourth and fifth against Lowrie Paving Company alone. The first count alleges that McGuire and Hester negligently dug a ditch along Parker Avenue, 12 feet deep, negligently failed to give plaintiff notice of intention to make the excavation, negligently operated or permitted Lowrie to operate heavy trucks upon the sidewalk while said ditch was open between said ditch and the building, thereby causing the sandy soil at the excavation to slip and shift, and negligently failed to take reasonable precautions to sustain plaintiff's land. All of this caused the soil under plaintiff's building to settle and thereby plaintiff's building settled, causing cracking of the inside and outside walls and foundation and other damage.

The second count incorporates the first count and alleges further that the excavation was made pursuant to a contract between the city and county of San Francisco and McGuire and Hester by which the latter agreed to hold harmless and indemnify the city and county against all damages to property resulting from the performance of the contract, and that such indemnity provision inured to plaintiff's benefit.

The third count alleges that the damage was caused by the removal of lateral support of the building by direct excavation or by jarring loose by the heavy trucks.

The fourth count alleges that Lowrie, notwithstanding that it had notice that its trucks were damaging plaintiff's building, negligently operated trucks upon the sidewalk and street at a time when the Parker Avenue excavation was open, thereby causing the apartment building to settle.

The fifth count alleges additionally damage as the result of the removal of lateral support which was jarred loose as the result of said operation by Lowrie of its trucks and equipment.

The construction work involved here was a streetcar track removal, sewer installation and street improvement, done under contract between the city and county and McGuire and Hester, who subcontracted to Lowrie the removal of tracks and the paving of street areas.

---

*For convenience plaintiff's assignors, Mr. and Mrs. Tarnavsky, will be referred to as "plaintiff."

1. (a) *The Case Against McGuire and Hester.*

We will first consider the evidence as it affects McGuire and Hester. On April 29 and 30, 1952, Lowrie removed the streetcar tracks from Parker Avenue to the near line of California Street, and the pavement in the street area, thus creating a dirt strip 20 feet wide, 34 feet from the apartment building. On May 2 and 5, McGuire and Hester dug a ditch in this strip, 9½ feet or 10 feet deep with sloping sides. May 5 and 6, they installed the sewer pipe, partially backfilled the ditch and compacted it by jetting. May 21 and 22, McGuire and Hester completed the backfilling of the Parker Avenue ditch, compacting it by jetting.

May 21, Lowrie removed the pavement west of the ditch. May 28, Lowrie paved a 15-foot strip in the backfilled ditch area. June 5, Lowrie paved the west side of Parker Avenue. About June 12 Lowrie removed and repaved the parking strips on the east and west sides of Parker Avenue.

All of the above work was on Parker Avenue. From May 6 to 26, McGuire and Hester cut and removed a 20-foot strip of the existing pavement at the intersection and along the middle of California Street (the rails had been removed prior thereto) and dug a ditch 6 feet wide in the center of that street. The edge of this ditch was 39½ feet from the building. As the California Street ditch was dug, sewer pipe was installed, the ditch backfilled and compacted by jetting. Thereafter McGuire and Hester covered the ditch area on California Street with concrete. Thereafter Lowrie repaved the ditch area with asphalt. This was the only work done by Lowrie on California Street. There is no evidence that McGuire and Hester jointly worked with Lowrie on any portion of the job, although at one time McGuire and Hester equipment followed within 50 feet of the Lowrie work. They collaborated only to the extent that certain stages of the work had to be performed by one before the other could perform later stages.

As the ditch was dug the pipe was almost immediately placed therein, so that the ditch to its full depth was not open for more than a day. The immediate backfilling came only halfway or to the top of the pipe except at the joints.

Crowley, inspector for San Francisco, testified that McGuire and Hester used sound construction practices in digging and sloping the ditch on Parker Avenue and sloping and lagging the ditch on California Street and in the jetting and backfilling of both ditches, and that the work was done in ac-

cordance with the plans and specifications with one exception: That was that, although general specifications applicable to all city contracts specify that all ditches be lagged, the Parker Avenue ditch was dug with a natural slope without lagging. This departure was with his consent and was sound construction practice. However, he did testify that a complete, vertical slope, straight up and down, 90 degrees, was not in accordance with sound construction practice. Crowley testified that he observed no sloughing of the ditch when he was there. It was only on Parker Avenue that the ditch was not lagged. In the intersection and on California Street the ditch was lagged, as soon as the ditch was 3 or 4 feet deep. There was some sloughing of the first 3 feet. This is unavoidable. It caused some settlement of adjacent pavement of from a few to 7 inches, causing a 7-foot strip of adjacent pavement to tip in some places and a preexisting joint 7 feet of pavement on each side of the strip to open a little. There was no further settlement after the 20-foot strip was paved.

At all times during the McGuire and Hester work the portions of Parker Avenue and California Street between the ditch areas and the building were kept open to and used by McGuire and Hester trucks, trucks delivering sewer pipe, and trucks, buses and automobiles of public traffic. The portions of both Parker and California Street kept open and used by all public traffic and construction trucks did not settle or develop any cracks. Dirt removed from the ditch was not deposited on the street but either loaded directly into dump trucks and hauled away or used in backfilling another portion of the ditch. The only use of a bulldozer by McGuire and Hester was in the leveling of the final stage of backfilling the ditch on the westerly half of Parker Avenue, which occurred on May 21 and 22. The ditch excavating was done by a crane with a clamshell bucket.

The ditch was 10 to 11 feet deep, with a surface opening of 8 to 9 feet in width. The bottom of the trench was 3 feet to 39 inches wide. The excavations in front of the building were not completely filled until May 21 or 22, which meant that the ditches were left open in part for approximately 3 weeks.

Mr. Tarnavsky, a tenant, Austin, a contractor, and the manager of the building, testified that the building prior to the work in question was in good condition. The manager testified that the ordinary cracks which existed were enlarged

after the work was done. Austin testified that while the work was being done a lot of cracks developed, the tile on the vestibule sunk, buckled and cracked. The staircase developed a slope. After the work was done the hardwood floors in the hallway developed waves, and in the bathrooms, the tile walls moved away from the walls. There was other evidence of damage to the building which occurred after the work was done. Tarnavsky testified that he observed cracking while bulldozers were working and when trucks were removing dirt and that the damage has worsened since.

A contractor and Dr. Nickell, plaintiff's geological expert, testified that the number and nature of cracks in the building were not to be expected and indicated a failure of the general foundation, yet the manner of construction and the sub-footing as shown on the plans were sufficient to insure against excessive cracking. There was evidence that the plans were complied with in the construction of the building, and that the soil under the foundation was as hard as a rock. In later stabilizing the settlement of the building the contractor found the soil under the foundation to be disturbed on the Parker Avenue frontage, containing cracks running parallel to Parker Avenue. The most severe damage was at the corner of the building on the Parker Avenue frontage, and at the southeast corner of the building.

Dr. Nickell testified that ditches dug in sandy soil required a slope of 1 to 1. The actual slope was about $\frac{1}{4}$ to 1 which is steeper than the natural angle of repose for sand. There seems to be a dispute between the parties as to the effect of this difference in slope. However, Dr. Nickell considered the difference as important in determining the cause of the building damage. Although there was no testimony that there was material sloughing of the sides of the Parker Avenue unlagged ditch or that the sides sloughed beyond the edge of the 20-foot dirt strip or that it undermined the pavement, Dr. Nickell nevertheless opined that sloughing was one of the factors contributing to the damage. He testified: ". . . in the case of this trench, I believe that the open trench and the method of back-filling and the slight evidence of slough-ing along Parker as experienced, and the evidence elsewhere of sloughing, all contributed to the instability of the founda-tion. In my opinion, the damage to the building happened directly from the passage of heavily loaded equipment setting up strong vibrations which brought about a deformation within the foundation."

As to the fact that much of the damage to the building occurred after 1952, Dr. Nickell opined that the instability of the building's foundation was initiated when by virtue of the excavation the volume of the material originally supporting the foundation had been changed and that the building had to readjust to a new equilibrium which would be commensurate with the new volume of supporting material; further that the material not directly under the foundation of the building offered lateral support or "lateral confinement to the material supporting the building" and removal of this material in the ditch diminished the lateral support to the building. This gave an opportunity for adjustment of all of the materials, instead of their retention in status quo. This readjustment would be progressive. Dr. Nickell testified that by 1952 the building would have reached a state of equilibrium which could only be affected by a change of equilibrium, such as a "closely lagged ditch to a certain depth, excavated under certain conditions, not adequately refilled by material which would retain the balance of stresses within the foundation. It might well be the passage of heavy equipment. All of the elements mentioned in this case. . ." Dr. Nickell stated that uncontrolled jetting as he termed the method used here, and vibration, all have a deleterious effect on the building's foundation. A reading of Dr. Nickell's testimony shows that it was his opinion that the failure to lag the ditch on Parker Avenue, and the method of jetting used, caused a condition to exist which enabled the vibration caused by the passage of equipment and trucks used in the work as well as the trucks and vehicles of the general public to bring about the damage to the building. Defendants' main quarrel with Dr. Nickell is that the bases upon which he drew his conclusions were not present in the case. However, there is evidence to support each basis. The fact that in most instances such evidence is controverted by other evidence is not enough to throw out Dr. Nickell's opinions, but is a matter for the jury.

While Dr. Nickell stated that a deep trench should be lagged to prevent burial of the men working in it and imperiling construction activities, his testimony as a whole indicates that it should be done also to prevent sloughing or disturbance of side slopes to prevent damage to building foundations. While he said that the amount of sloughing would have to be substantial to have caused effect on the building, he further testified: "But the amount of sloughing

that results from the open trench and vibrations releases the support to material between the trench and the building with the result that there is opportunity for readjustment within that mass. . . . I think the absence of sloughing merely means that the material stands under the temporary conditions secure; that it does not, however, insure adequate lateral support over time, there being a temporal relationship involved there. . . . [I]n the case of this trench, I believe that the open trench and the method of back-filling and the slight evidence of sloughing along Parker as experienced, and the evidence elsewhere of sloughing, all contributed to the instability of the foundation.''

Dr. Nickell testified that the existence of a ditch would not be significant in the transmission of the vibration, but that plaintiff's building had its lateral support crucially impaired by the work. He based his opinions on his observation of the building for two hours just prior to trial, from listening in court to the witnesses describe the conditions of the trench and the materials there, and his general geological knowledge of the area seen in part by his travel to the building and back. It was his opinion that the degree of cracking in the building reflected something beyond the adjustment of the building, which normally occurs in time.

Considering the testimony of witnesses to the effect that the building had cracked only in a minor way in the 20 years of its existence prior to the work in question, that the building commenced to crack in a major way during the work, and the opinion of Dr. Nickell, there was substantial evidence from which a jury might have found defendant McGuire and Hester negligent and that such negligence caused or contributed to the damage to the building.

A great deal of Dr. Nickell's testimony was speculative and was based upon conjecture, surmise and assumption of matters not supported by the evidence. However, there was sufficient of it that was based upon evidence to require that the jury determine his credibility and weigh his opinion against the contrary evidence of defendants. In this connection it is advisable to bear in mind the rule in this state governing nonsuits. A statement of the rule which often appears in the cases is this: ''. . . a nonsuit may be granted only when, disregarding conflicting evidence, giving to the plaintiff's evidence all the value to which it is legally entitled, and indulging in every legitimate inference which may be drawn from that evidence, the court properly determines that

there is no substantial evidence to support a verdict in favor of the plaintiff.'' (*Leonard* v. *Watsonville Community Hospital* (1956), 47 Cal.2d 509, 514-515 [305 P.2d 36].)

Nonsuit may not be denied merely because there is testimony which *may* make out a prima facie case for plaintiff, when considered out of context, or when predicated upon hypothetical facts unsupported by the evidence. *It is not a question of whether a jury may return a verdict for the plaintiff, but whether such a verdict, if returned, finds support in the record, and may be permitted to stand, keeping in mind the issues and what it is that the plaintiff must prove.* It is not simply a matter of authority, but of the court's *duty* to grant a nonsuit in a proper case. This view of the rule is deeply rooted in California law. It was laid down by our Supreme Court during its first year of existence. (*Ringgold* v. *Haven & Livingston,* 1 Cal. 108; *Dalrymple* v. *Hanson,* 1 Cal. 125; *Mateer* v. *Brown,* 1 Cal. 221.) Thus, in *Ringgold,* the court said: '' 'If the evidence would not authorize a jury to find a verdict for the plaintiff, or if the court would set it aside, if so found, as contrary to evidence, in such case it is the duty of the court to nonsuit the plaintiff.' The power of a court, acting according to the course of the common law, to set aside a verdict, which is contrary to, or unsustained by, the evidence, is too clear to admit of a doubt; and the power of a civil law court of Second Instance to reverse the judgment of a court of First Instance, on the ground that it is against the weight of evidence, is also unquestionable. If, therefore, upon a given state of facts, a court would be obliged to set aside a verdict of the jury as against the evidence, we see no reason or propriety in submitting such facts to them for their consideration. When their determination will be a nullity, why compel them to deliberate? Such a course is neither creditable to the law, nor complimentary to the jury. Nor, in adopting the practice of nonsuit, is there to be apprehended any danger of encroachment upon the rights of parties, or of abridgement of the prerogatives of juries. This system of trial can be expected to operate beneficially, and with certain, not fickle, results, only when the practical sense of a jury is guided by, and acts in subserviency to, established principles of law, expounded and enforced by the court. We are of the opinion, therefore, that the power of compulsory nonsuit should be upheld.'' (Pp. 114-115.)

The Ringgold case has been cited a number of times, as

recently as last year in *Rufo* v. *National Broadcasting Co.*, 166 Cal.App.2d 714 [334 P.2d 16]. No case appears expressing disapproval of the rule as there stated. In the Rufo case the court held that where there is no proof of negligence on the part of the defendant and no proof of proximate cause, a motion for a nonsuit, directed verdict, or judgment notwithstanding the verdict, is in order. Quoting from *Farmer* v. *Fairbanks*, 71 Cal.App.2d 70, at page 80 [162 P.2d 26], the court in the Rufo case said: " '. . . While all reasonable inferences are to be drawn from the evidence and all conflicts to be resolved in plaintiffs' favor, nevertheless the inferences cannot be based upon speculation or conjectures, but must be based upon "a fact legally proved." (Code Civ. Proc., §§ 1958 and 1960.)' " (*Rufo*, p. 720.)

■ Although much of the testimony of plaintiff's witnesses must be disregarded, there is still left enough that, if believed, would support a judgment for plaintiff.

1. (b) *The Case Against Lowrie.*

■ The evidence clearly shows that Lowrie had no part in the construction of the ditch. The negligence charged in the fourth count against Lowrie was that it operated heavy trucks over and along the sidewalk in front of the building while the ditch was open. The fifth count charged that the lateral support of the building was removed by the jarring caused by Lowrie's heavy trucks as well as McGuire and Hester's equipment.

Tarnavsky testified that during the work he saw vehicles crossing the sidewalks in front of his building, running on the sidewalk, and loading trucks; that he spoke to Lowrie's foreman about it. The foreman said that they would repair the damage to the sidewalk. On one occasion Tarnavsky saw a block of cement fall from a truck onto the sidewalk, damaging the sidewalk. The building shook terribly when the truck was on the sidewalk. He saw trucks on his sidewalk many, many times. Sommer, the apartment manager, saw a "machine truck" and a rubber-tired scraper come on the sidewalk. A tenant, Austin, one day saw a dump truck half way up the sidewalk being loaded with rock. The sidewalk was damaged by the vehicles on it and had to be repaired. A portion still needed repairing. The cost of this repairing was one of the items of damage sued for. In any event, plaintiff was entitled to recover for this damage.

Mr. Lowrie testified that moving dump trucks create marked vibration. The time when the witnesses saw the trucks on

the sidewalk was during the time when McGuire and Hester were doing no work on Parker Avenue. While defendant Lowrie contends that the evidence fails to show that these trucks were Lowrie's, the statement of Lowrie's foreman to Tarnavsky and the fact that they were not those of McGuire and Hester, coupled with the fact that Lowrie was the only other contractor on the work, would justify the inference that they were Lowrie's trucks. There was evidence that the shed of McGuire and Hester was dragged along and across the sidewalk.

The eyewitness testimony concerning the cracking of the building plus the opinion of Dr. Nickell to the effect that the vibrations caused by the trucks on the sidewalk and by the vehicles of McGuire and Hester and others using the street while the material between the trench and the building had been loosened by the lack of support in the open ditch caused the loss of lateral support to the foundation of the building, required that the case be submitted to the jury.

2. (a) *Admissibility of Contract and Specifications.*

Both defendants claimed that they strictly complied with the plans and specifications. In the specifications there was a requirement of lagging. The specifications were admissible as to McGuire and Hester on this question; also as some evidence of the reasonable standard of care.

There was a provision in the contract requiring the contractor to take out public liability and property damage insurance to protect him and any subcontractor against damages for injury to persons or property caused by the contractor, or any subcontractor or anyone employed by either, whether through negligence or otherwise. Plaintiff seems to contend that this provision creates a new liability in favor of third persons where one would not exist except for this provision. There is no merit to this contention. Nor was the contract admissible on the theory that the Tarnavskys were third-party beneficiaries. If they were, the contract would only be important if they obtained a judgment against defendants. It would be a matter of no concern to the jury. The court did not err in refusing to admit the contract.

2. (b) *City Ordinances.*

Municipal Traffic Code, section 86, provides: "It shall be unlawful for the operator of any vehicle to drive such vehicle within any sidewalk area except at a permanent or temporary driveway." Defendants contend that this ordi-

nance was only for the benefit of pedestrians using the sidewalk, and claim that *Satterlee* v. *Orange Glenn School Dist.*, 29 Cal.2d 581 [177 P.2d 279], and *Bateman* v. *Doughnut Corp. of America*, 63 Cal.App.2d 711 [147 P.2d 404], apply, which hold that liability for violation of an ordinance extends only in favor of such persons as belong to the class intended by the legislative body to be protected. Although the provision is in the traffic section of the Municipal Code (where else would it be?) it is not limited to protecting persons. It necessarily must be for the purpose of protecting property as well. The section should have been admitted as against Lowrie as violation of it would be negligence *per se*.

Section 343, Public Works Code, provides in part: "All such trenches [i.e., trenches in a graded street] shall be backfilled . . . within three (3) working days from the time such material [i.e., material from the trench] is placed upon the street . . ." As there was testimony that the trench was left open for two weeks or more, this ordinance should have been admitted as against McGuire and Hester.

2. (c) *Check.*

Exhibit 15 for identification is a check made by Tarnavsky to a painting contractor for work done on the building some six to seven months prior to the work in question here. Plaintiff has failed to demonstrate any relevancy or materiality to this check. The court did not err in refusing to admit it.

3. *Inspection by Jury.*

We deem it unnecessary to pass upon plaintiff's contention that the court erred in failing to pass upon plaintiff's many requests for inspection of the premises by the jury. Allowing a jury to inspect is a matter in the sound discretion of the court. It is obvious that here the court, feeling that plaintiff failed to make a case of liability, did not exercise its discretion one way or another on the subject. Certainly the jurors were not competent to determine the cause of the damage by mere inspection of the premises. At the retrial the court will determine whether it is necessary for the jury to inspect in order to determine the extent (not the cause) of the damage.

4. *Striking Portions of Defendant's Answer.*

The answer of McGuire and Hester stated: "This defendant admits . . . that during the time when this de-

fendant was installing a sewer pipe on Parker Avenue in front of said 2 Parker Avenue, defendant Lowrie Paving Company, Inc., operated trucks over and along the said sidewalk in front of 2 Parker Avenue . . .'' During the trial the court permitted such admission to be stricken from the answer. Obviously Lowrie was in no way bound by this statement. If under any circumstances it could be used as evidence against McGuire and Hester, the mere fact that it had been stricken from the answer would not prevent it from being so used. (See *Tostevin* v. *Douglas*, 160 Cal.App.2d 321, 327 [325 P.2d 130], as to the effect of statements in pleadings.) There was no error in the court's action.

5. *Activity Not Ultrahazardous.*

■■■■ As the case may be tried again, it is necessary that we determine another contention made by plaintiff. There is no authority for his contention that the removal of the street car tracks and pavement and the digging of a sewer trench constitute an ultrahazardous activity requiring the application of the rule of absolute liability for damages such as is expressed in *Kaufman* v. *Tomich*, 208 Cal. 19 [280 P. 130], where, different from the fact in this case, the work to be done was ''inherently dangerous.'' (P. 26.)

6. *No Necessity for Notice of Excavation.*

■■■■ Nor does Civil Code, section 832, apply to a situation of this kind. It requires each coterminous owner to give notice to owners of adjacent lands and buildings of intention to excavate. Defendants are not owners of land adjacent to plaintiff's land. Moreover, the cause of plaintiff's damage was not failure to notify plaintiff of the intended work but the manner of doing the work, if the jury should believe plaintiff's evidence.

The judgments are reversed.

Tobriner, J., and Coakley, J. pro tem.,* concurred.

Petitions for a rehearing were denied January 11, 1961.

---

*Assigned by Chairman of Judicial Council.