[Civ. No. 21579.   First Dist., Div. One.   Oct. 20, 1964.]

JOHN J. GUILLORY, Plaintiff and Appellant, v. AMERICAN PRESIDENT LINES, LTD., Defendant and Respondent.

McMurray & Tepper and Lloyd E. McMurray for Plaintiff and Appellant.

Willard G. Gilson, Peter N. Swan and Lillick, Geary, Wheat, Adams & Charles for Defendant and Respondent.

BRAY, J.*—Plaintiff appeals from judgment of nonsuit in favor of defendant American President Lines, Ltd., in an action for damages for personal injuries allegedly resulting from negligence of defendant's agents.

## QUESTIONS PRESENTED.

1. Was there any evidence of defendant's negligence?
2. Did the doctrine of res ipsa loquitur apply?

## STATEMENT OF FACTS.

Plaintiff is a longshoreman in San Francisco. At the time of the accident he was employed by the California Stevedore and Ballast Company and had been assigned to special work as a "linesman" handling the mooring lines of ships as they arrived and departed. This was the usual kind of work assigned to men who were disabled from undertaking the normal work of loading and unloading ships. Plaintiff had a previous back injury which caused this disability, leaving him with what his doctor characterized "as a very vulnerable back."

On the evening of February 8, 1960, the SS President Taylor, owned by defendant American President Lines, Ltd., was approaching the United States Army Reefer Dock, located on the Oakland estuary, for the purpose of picking up cargo. The ship was approaching with its port or left side nearest the dock. It was a dark rainy night and there was a wind blowing off the dock against the side of the vessel. To assist in mooring the vessel, plaintiff and five other linesmen had been employed by California Stevedore and Ballast Company. These six line handlers were to assist the vessel by pulling its heavy mooring hawsers ashore onto one portion of the dock and securing them to designated cleats or "bollards" on another portion of the dock.

Plaintiff was working on the dock near the stern of the vessel with two other line handlers, Ruben Nelson and Robert Rhodes. The customary procedure in tying a ship up to the dock was followed. First a line was run from the bow of the ship to a cleat or "bollard," then a light line called a "heaving line" was thrown to the dock from the ship. Attached to this line was a heavy 1½-inch wire and hemp line

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.

called a "spring line." This line was to be pulled onto the dock and its loop or eye to be placed over a bollard. Then by means of a winch on the ship, the stern of the ship would be brought against the dock. At the time the head of the spring line was pulled onto the dock, the ship was angled out from the dock, bow in and stern away.

On the ship this spring line was coiled between two capstans on the ship's stern. It was the duty of a seaman, John Orser, employed by defendant, to play out this line through an opening on the capstans called a "chock." A half turn of the line is taken around a "bitt" to keep the line from running out too fast. Otherwise the weight of the line between the ship and the dock would cause the line to play out too fast and it would fall into the water. When the heaving line was caught on the dock, Orser put the eye of the spring line through the chock and attached it to the heaving line. It was then the duty of the longshoremen to pull the spring line ashore. Orser waited until these men had pulled the line tight and then he started playing the slack out through the chock as the men on shore pulled the line. It was Orser's duty to use his hands "as a brake" to control the slack. Orser could not see the men on the dock. A ship's mate standing by the rail could and would signal Orser how much line to feed out. It was the duty of the longshoremen as well as the man on the ship to keep the spring line out of the water. The stern "chock" from which the spring line came was about 30 to 35 feet from the dock. After pulling some 18 to 30 feet of spring line onto the dock, Nelson removed the heaving line from the eye of the spring line. Thereupon, he held the eye of the line. Rhodes, about 6 feet behind him, held onto the line with both hands. About 6 feet behind Rhodes plaintiff likewise held the line with both hands. The three men then started "running" with the line, dragging it toward a mooring cleat some 75 or 100 feet away. Plaintiff testified that he was approximately 3 or 4 feet from the edge of the dock inside the "stringer piece." He was facing the cleat at an angle toward the ship. He was holding the line about belt level with his left hand on the bottom and his right hand on top.

As the men were moving toward the cleat, the "spring [line] stopped with a sudden jerk." Immediately after this sudden jerk or stoppage, the line again became slack. This short jerk jerked plaintiff "back, twisted from the left to the right side," and caused a sudden pain in plaintiff's al-

ready injured back. He immediately dropped to one knee in a sort of crouch and was no longer able to continue work. It is this injury of which he complains. Plaintiff testified that it was the pain in his back, not the jerk, which caused him to drop the line and to go to his knees. Nelson described the incident as a "sudden stop . . . of the line" which "[p]retty near threw us all over." Both plaintiff and Nelson admitted that they were not looking backward and did not know what caused this sudden stopping of the spring line.

The line sags as it runs from the spring chock on the deck of the vessel to the dock, it being too heavy for the men to pull it out straight. There is, thus, an unavoidable belly of about 6 feet in the line between the spring chock and the "stringer piece."[1] Nelson testified that the line did not catch in the water. Plaintiff testified that it was his duty to see that the line did not catch on any of the cleats or other obstructions as it passed along the stringer, and that the line did not catch on any such obstruction. The linesmen were all experienced and none of them stopped pulling before the accident nor could tell what caused the jerking of the line. Neither plaintiff, Nelson nor Rhodes slipped or tripped, and each was pulling his share of the load.

1. No Evidence of Defendant's Negligence.

The rules applicable to the granting of a motion for nonsuit are well settled in California. They are well epitomized in the following cases. ■■■ "A trial court must deny a motion for a nonsuit at the close of plaintiff's case 'if there is . . . any substantial evidence, which, with the aid of all legitimate inferences favorable to the plaintiff, tends to establish the averments of the complaint, or, in other words, where the plaintiff's evidence is sufficient to support a judgment on the verdict. It should deny a nonsuit even where there is a conflict in the evidence and some evidence tends to sustain the plaintiff's case, or when the evidence of the plaintiff is such that different conclusions can reasonably be drawn therefrom. If there is any doubt, it is the duty of the court to let the case go to the jury.' (9 Cal.Jur. 558-559.) ■■■ And as to our duty, 'The uniform rule which an appellate court should follow in disposing of an appeal from a judgment of nonsuit is, that the court must view the evidence in the light

---

[1]The stringer piece is a large square or rectangular beam which is affixed about one foot from the edge of the dock. It runs parallel to the edge of the dock and the line slides along this beam as it is dragged.

most favorable to appellant, must disregard all inconsistencies and draw only those inferences from the evidence which can reasonably be drawn which are favorable to appellant. [Citations.]' '' (*Golceff* v. *Sugarman* (1950) 36 Cal.2d 152, 152-153 [222 P.2d 665].) See also *Jones* v. *Hotchkiss* (1956) 147 Cal.App.2d 197, 201-202, 204-205 [305 P.2d 129], concurring opinion; *Seneris* v. *Haas* (1955) 45 Cal.2d 811, 821 [291 P.2d 915, 53 A.L.R.2d 124].)

■ A motion for nonsuit concedes the bulk of the facts proved. The court has no power to weigh the evidence. ■ In passing on a judgment of nonsuit, the appellate court must view the evidence as though judgment had gone in favor of the appellant and order a reversal if such judgment could be sustained. (*Raber* v. *Tumin* (1951) 36 Cal.2d 654, 656 [226 P.2d 574].) ■ However, as the court in *Ulwelling* v. *Crown Coach Corp.* (1962) 206 Cal.App.2d 96, noted at pp. 104-105 [23 Cal.Rptr. 631] : ''[B]efore a judgment of nonsuit can be disturbed, there must be some substance to plaintiff's evidence upon which reasonable minds could differ; proof that raises mere speculation, suspicion, surmise, guess or conjecture is not enough to sustain his burden. [Citations.] '. . . as pointed out in *Reese* v. *Smith,* 9 Cal.2d 324, at page 328 [70 P.2d 933] : ''If the existence of an essential fact upon which a party relies is left in doubt or uncertainty, the party upon whom the burden rests to establish that fact should suffer, and not his adversary. [Citation.] A judgment cannot be based on guess or conjectures. [Citation.]'' . . . Substantial evidence is required to establish each essential affirmative allegation—a scintilla of evidence is not sufficient for that purpose. [Citation.]' . . . ■ Thus, the burden was upon plaintiffs to establish that defendants had some duty to them and breached it, and that such breach was the proximate cause of the accident; if there is no evidence of substance tending to prove the controverted facts necessary to establish the plaintiffs' case, the motions for nonsuit were in order.'' (See *Goggin* v. *Reliance Ins. Co.* (1962) 200 Cal.App.2d 361, 364 [19 Cal.Rptr. 446] ; *Cassell* v. *McGuire & Hester* (1960) 187 Cal.App.2d 579, 590 [10 Cal.Rptr. 33] ; *Rufo* v. *N.B.C. Nat. Broadcasting Co.* (1959) 166 Cal.App.2d 714, 720 [334 P.2d 16] ; *Bravo* v. *Sharkey* (1950) 97 Cal. App.2d 883 [218 P.2d 785] ; *Alves* v. *Lopez* (1958) 159 Cal. App.2d 705, 707 [324 P.2d 652].)

■ In *Cassell, supra,* in reversing a judgment of nonsuit, the court pointed out, at page 589: ''Nonsuit may not be

denied merely because there is testimony which *may* make out a prima facie case for plaintiff, when considered out of context, or when predicated upon hypothetical facts unsupported by the evidence. *It is not a question of whether a jury may return a verdict for the plaintiff, but whether such a verdict, if returned, finds support in the record, and may be permitted to stand, keeping in mind the issues and what it is that the plaintiff must prove."*

■ Defendants contend that what caused the stopping of the line is a matter of speculation and that therefore plaintiff has failed to meet the burden of showing what caused the accident. Although there is no evidence which directly shows what caused the stopping of the line, a reasonable inference from the evidence can be drawn that it was caused by Orser "snubbing" or stopping the playing out of the line. Supporting this inference is the following: Plaintiff testified that the line did not catch on the stringer or on the dock. Nelson testified without objection, "It was just something stopped it [the spring line] on the deck, I think, because it wasn't on the dock that stopped it, any place on the dock. That is the finest dock we got to work on. Nothing ever is fouled up there." There was no testimony by Seaman Orser that he did not stop the line. He described how it was his duty to keep the line from playing out too fast. He indicated that he did not have any particular remembrance of his actions that day other than that he was following the usual routine.[2] He could stop the outward progress of the line "instantaneously by very slight pressure holding back the line." When asked, "Do you have any recollection of the signals that the mate gave you that particular day?" he replied, "Not, not particularly. Like I say, there was nothing out of the ordinary that happened on the deck." This statement would not constitute a denial that the seaman stopped the line that day because it would not be out of the ordinary for him to stop the line.

Thus, the evidence being such that the jury could have drawn a reasonable inference (although not necessarily a required inference), the question of whether the stopping of the line was done by the seaman was one for the jury and not for the court.

■ Assuming then that the seaman "snubbed" the line the next question, and the most serious one, is whether the act

---

[2]He did at one time look over the side of the ship and saw its angle with the dock but he couldn't say what the exact angle was.

of snubbing was a negligent one. Here there is a complete absence of evidence or reasonable inferences therefrom to support a finding of negligence. The act of snubbing was customarily to be expected. The longshoremen knew that. Nelson was asked, ''would you agree with me . . . that when the crew has given you enough line so that there's a sag in the line and that sag in the line is in danger of getting down near the surface of the water, they should stop the line and not give you any more, is that correct?'' He answered ''That's right.'' He was then asked, ''When they stop, that causes a little bit of a jerk in the line, doesn't it?'' He replied ''Yes.'' No one testified that the snubbing of the line would be an unusual or an unexpected act, nor is there any evidence from which it can be inferred that the seaman acted negligently or without the exercise of due care for all reasonably foreseeable eventualities. While Seaman Orser's duty was to feed the line out to the men on the pier, plaintiff included, it was also his duty to prevent the line from slipping into the water or below the edge of the pier if there was too much slack line. It was therefore his duty to snub the line at various times, a duty of which plaintiff and the others were well aware. In the performance of these duties he operated entirely under the supervision of an officer on deck who could see the men on the pier and their progress with the line. There was no evidence that the movement in the line was other than would be expected when snubbing occurred. The jerk of the line, while it caused plaintiff to turn around, did not throw him, nor was it strong enough to jerk the line out of his hands or the hands of the other two men holding the line.

*Imperial Oil, Limited* v. *Drlik* (6th Cir. 1956) 234 F.2d 4, cited by plaintiff, is not in point. There the plaintiff was injured while bending over a cable out of sight of a winch operator. Without any warning, without any signal from the plaintiff or observation by the winch operator, the operator suddenly tightened the cable throwing the plaintiff down. The court held the negligent act of the defendant was the failure to provide a watchman to advise the winch operator when it was safe to operate the winch. The main distinction between *Imperial Oil* and our case is that in the former the winch was set in motion unexpectedly and with great force, while in the latter the stoppage of the line was one which should have been expected and which could have occurred due to other causes than the action of the seamen. There is no evidence in our case that when snubbing occurred it was expected that the longshoremen would be warned by anyone

on the ship. It clearly was an act for which the men handling the line were expected to be prepared, and one which would not have injured plaintiff if he had a normal back. There is no suggestion in the evidence that defendant or defendant's seaman knew that plaintiff had a back condition which was such that a jerk on the line would cause him trouble. (See *Rosenquist* v. *Isthmian S.S. Co., infra,* at p. 489.) Seaman Orser could not be held to be negligent in performing a natural and normal act of line holding and one which he knew would cause a stoppage of the line which the handlers were accustomed to anticipate. There was no showing that the sudden stopping of the spring line by snubbing created a foreseeable risk of injury to the line handlers. The situation here is somewhat akin to that in *Rosenquist* v. *Isthmian S.S. Co.* (2d Cir. 1953) 205 F.2d 486, where a seaman sustained a hernia when another seaman dropped one end of a folded 200-pound tarpaulin the two men were carrying. The statement of the court there applies to the situation here. "[W]e cannot think that the mere fact that Violente let slip his end of the tarpaulin bundle was evidence of negligence by him. To let his end drop to the floor, a distance of not more than three feet, was most unlikely to cause any injury to the plaintiff at the other end of the bundle. Even if it be assumed that the sudden drop added to the dead weight by imparting to the plaintiff's end some of the energy of the falling end, the likelihood that this would put such a strain on the plaintiff as to result in injury seems to us too remote to require an ordinary seaman to anticipate it. . . . *Negligence may be measured as a product of the gravity of the injury, if it occurs, multiplied by the factor of its probability.* The chance that any serious danger would happen from dropping Violente's end of the tarpaulin was substantially zero. Hence we cannot think that Violente was charged with any duty towards plaintiff to guard against letting slip his grip on the tarpaulin. Accordingly we hold that the court erred in submitting to the jury the issue of negligence by Violente." (P. 489; italics added.)

The evidence in our case shows that snubbing was to be expected and that the chance that anyone would be injured by it was not known to the ship's employees, nor that there was any likelihood that it "would put such a strain on the plaintiff as to result in injury." Applying the rule stated in *Rosenquist, supra,* at page 489, "Negligence may be measured as a product of the gravity of the injury. multiplied by the

factor of its probability,'' negligence may not be found in our case.

## 2. Res Ipsa Loquitur.

The doctrine of res ipsa loquitur does not apply in this case for the reason that one of the requirements of the doctrine is missing—namely, the requirement that in the light of past experience the accident be one which ordinarily would not occur in the absence of someone's negligence.

For the doctrine to apply, three conditions must be met. The accident must be of a kind which ordinarily does not occur in the absence of someone's negligence. Secondly, it must be caused by an agency or instrumentality in the exclusive control of the defendant. And, thirdly, it must not have been due to any voluntary act or contribution on the part of the plaintiff. (*Shahinian* v. *McCormick* (1963) 59 Cal.2d 554, 559 [30 Cal.Rptr. 521, 381 P.2d 377]; *Wolfsmith* v. *Marsh* (1959) 51 Cal.2d 832, 835 [337 P.2d 70, 82 A.L.R.2d 1257].)

It is the first condition which is missing in this case. The burden is upon the plaintiff to present sufficient evidence from which the jury may draw the conclusion that negligence is the most likely explanation. (*Roddiscraft, Inc.* v. *Skelton Logging Co.* (1963) 212 Cal.App.2d 784, 797 [26 Cal.Rptr. 277].) The plaintiff need not show that this is a type of accident which *must* occur because of someone's negligence, but only that, in the light of past experience, expert testimony, common knowledge, or the circumstances of the particular case, the accident was more probably than not the result of someone's negligence. (*Roddiscraft, Inc.* v. *Skelton Logging Co., supra,* at pp. 796-797.) Where reasonable men may differ as to the balance of probabilities, the question whether an inference of negligence is to be drawn should be submitted to the jury. (*Seneris* v. *Haas* (1955) 45 Cal.2d 811, 827 [291 P.2d 915, 53 A.L.R.2d 124].)

From the evidence presented, it is clear that there is nothing in the record which would support an inference that the accident more probably than not occurred as a result of any negligence on the part of defendant. As plaintiff well knew the line is often stopped from playing out from the ship to prevent its sliding into the water or below the edge of the dock. There is nothing which would indicate that any particular stoppage pursuant to this normal routine of tying up the vessel would result in injury. The tying up of a ship is not a matter of common knowledge. There was no expert

testimony to the effect that such stoppage would not occur in the absence of negligence. (On the contrary the testimony was that such stoppage was to be expected.) Nor was there any evidence of past experience which would cause the doctrine to apply.

*Imperial Oil, Limited, supra,* 234 F.2d 4 and *Leathem Smith-Putnam Navigation Co.* v. *Osby* (7th Cir. 1935) 79 F.2d 280, cited by plaintiff, do not apply. As hereinbefore set forth, the injury to the plaintiff was not one which ordinarily could not have occurred if someone were not negligent. In *Leathem Smith-Putnam, supra,* the injury was caused by an explosion in the ship's steering gear room. In *Imperial Oil, Limited, supra,* at page 7, the accident was caused by a winch operator who "unexpectedly and without warning, set the winch in motion, causing the cable" being held by plaintiff "to become taut with great force. . . ." Obviously the two cited cases were ones in which it clearly appeared that ordinarily the accidents could not have happened without negligence and where the occurrences were ones not reasonably to be expected.

In *Hawley* v. *Alaska Steamship Co.* (9th Cir. 1956) 236 F.2d 307; *Seville* v. *United States* (9th Cir. 1947) 163 F.2d 296; and *Rosenquist* v. *Isthmian S.S. Co., supra,* 205 F.2d 486, hereinbefore discussed, the circumstances were more nearly akin to those in the case at bench.

In *Hawley, supra,* plaintiff brought an action under the Jones Act against the defendant shipowner for injuries sustained. The trial court granted defendant's motion to dismiss at the close of the presentation of plaintiff's evidence. Plaintiff was working in the hold of defendant's ship helping others stow cases of canned salmon which were being lowered into the hold on a pallet board operated by a winch. In the area in which plaintiff was working he had only about 2 or 3 feet between the edge of the hatch coaming and the stacks of canned salmon behind him. He testified that it was agreed among the men that when the pallet was lowered into the hold it was to be swung clockwise so as to allow more leeway as the pallet went under the port wing of the vessel. He further testified that the pallet board was swung counterclockwise and struck him, forcing him back against the cases of salmon. He could not jump out of the way because there was a ladder on one side and a drop of several feet on the other. Plaintiff contended on appeal that defendant failed to provide him with safe working conditions, with competent coemployees,

and that there was no adequate supervision. The court on appeal affirmed the dismissal, holding that on the facts there was not sufficient evidence to make out a prima facie case of negligence. (The standard on appeal from order of dismissal is similar to that to be applied on review of a nonsuit.) The court noted at page 311: "The evidence as to *how* the pallet swung and *how* it hit appellant is vague. Appellant testified that previous pallets had been swung clockwise, but that the pallet board which struck him was swung counterclockwise. However, the other two witnesses testified that they could not recall in which direction the pallet which struck appellant was moving. Without objection, appellant's witness Perry also testified that it would be immaterial which way the pallet was swung as either corner might have hit appellant. Perry also testified that the pallet board in question was not handled any more vigorously or roughly that day than any of the previous ones."

In *Seville, supra,* also tried under the provisions of the Jones Act, plaintiff was in charge of filling a rectangular sling board with ship's stores for a voyage out to Guam from San Francisco. The loading on the dock was out of the sight of the winchman who received the signal to lift the sling away from plaintiff from a watchman who could see both men. Plaintiff knew that the outward boom which raised the sling was not over the center of the sling and that therefore he would have to move away from the load before it was raised because it would swing toward him when lifted. Plaintiff did not move fast enough to escape the swing and it pushed him backwards causing him to fall and break two bones in his hand. Plaintiff claimed that one of the other men let go too soon. The court held that the statements of the two other men did not establish any negligence and plaintiff had not met his burden of proof. The court held the doctrine of res ipsa loquitur inapplicable, saying that it could not see the application of that doctrine "where, as here, there is the usual and expected swinging of a sling load. . . ." (P. 298.) In our case there was a usual and expected stopping of the line.

Our case is more of the type hereinbefore discussed in *Rosenquist, supra,* at page 489, where the court said, "This is not a case permitting application of the res ipsa loquitur doctrine. . . . The chance that any serious dangers would happen from dropping Violente's end of the tarpaulin was substantially zero." So in the case at bench, the chance that

any danger would happen from the snubbing of the line was substantially zero.

Judgment affirmed.

Sullivan, P. J., and Molinari, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 17, 1964.