[Civ. No. 10697.   Third Dist.   Dec. 6, 1963.]

NEOMA C. DOWDEN et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION, NEWTON POLANDER et al., Respondents.

Harold Wilsey, Jr., and William L. Fisher for Petitioners.

Everett A. Corten, Rupert A. Pedrin, James J. Vork, Rich, Fuidge, Dawson & Marsh, Patrick R. Maloney, T. Groezinger and Loton Wells for Respondents.

FRIEDMAN, J.—Petitioners are the surviving widow and children of Emery G. Dowden, who suffered fatal injuries in the course of his employment. Petitioners applied to the Industrial Accident Commission for an increased award pur-

suant to Labor Code section 4553, contending that the accident occurred as the result of serious and wilful misconduct on the part of Dowden's employer, Newton Polander. The commission denied the award and petitioners seek review.

For several years before his death Dowden had been employed as a worker on ranches operated by Polander in Colusa County. Occasionally it was necessary to move a harvester along a county highway. The harvester was a large piece of machinery with a tall structure or ''elevator'' in the center. When moved on the highway, it would be loaded on a low-bed trailer pulled by a diesel truck-tractor. Loaded on the trailer, the harvester had a height 20 to 21 feet above the ground. Three power transmission lines owned by Pacific Gas and Electric Company crossed the highway at an angle. The lines were 20 to 21 feet above the ground. The evidence does not disclose what lateral spaces separated these lines, but a photograph indicates that they were within a few feet of one another, being carried on a single line of poles. Each of these lines carried 12,000 volts. The harvester had to pass beneath these lines. When moving the harvester, Polander did not request the utility company to de-energize the lines. Rather, he would have one of his employees stand on the harvester and raise a wooden board into the air and lift the power lines to permit clearance of the harvester elevator. When raised, the power lines would be 6 to 8 inches above the highest point of the elevator.

On October 27, 1961, the day of the fatal accident, Polander was driving the diesel truck and trailer which carried the harvester along the highway. He stationed Dowden on the front part of the harvester. Dowden held a 1 by 4-inch board about 8 feet long. He was instructed to lift the wires by holding the board at an angle toward the rear, causing the wires to slide up and over the top of the board as the harvester moved forward. Another employee named Torres followed in a pickup truck. From where he sat in the truck, Polander could see the wires in the rear view mirror but could not see Dowden. The harvester successfully passed beneath the first of the three transmission lines. Polander saw the second wire lifted and started to drive forward. At that point the wire made contact with the harvester. High voltage electricity flowed through the harvester and into Dowden's body, inflicting injuries which caused his death some weeks later.

Polander testified that on other occasions the harvester had been moved under the power lines in the same manner and

that no trouble had occurred. He was present on these occasions. He knew that the lines carried a high voltage load but did not know the precise voltage. He stated, however, that once or twice the wires had flashed but caused no harm. On one occasion, an employee named Rocco was lifting the wires and got a flash. Polander knew that there was a "regulation" against operating a crane within 6 feet of a power line, but knew of no other government order or regulation restricting transportation of equipment within the vicinity of power lines.

In the following colloquies at the commission hearing, Polander described his own recognition of dangerous possibilities:

"[MR. FISHER] Q. Well, would it be fair to state, Mr. Polander, that this was a dangerous situation or condition which could very easily cause electrical burns and injury? . . . WITNESS [Polander]: Well, I had been under there before three different times without any trouble, and I never had any reason to think there was anything dangerous. MR. FISHER: Q. It was your frame of mind then this did not constitute a dangerous situation? A. Yes, I had been under there, and I didn't think it was that dangerous, which it wouldn't have been if it was done in the right way.

". . . . . . . . . .

"Q. Now, you stated, Mr. Polander, you had never had any—correct me if I am wrong in my attempt to paraphrase your testimony. As I understood it, you stated you had passed under there 3 or 4 times before. A. Three, I think. Q. And you never had any trouble before? A. Not any particular trouble, no.

". . . . . . . . . .

"WITNESS: Well, the way that I had planned to set it up to lift the wires to my knowledge is not dangerous if it were done right to my knowledge. I don't believe it was dangerous. REFEREE: Q. Again if they do right, assuming everybody does right, that nobody makes a mistake, no harm is going to result in any of these situations. A. There is always the possibility of human error. REFEREE: You didn't feel you needed to guard against that in your situation? WITNESS: In this particular case, no."

At another point in his testimony he said that he had told Dowden to "be careful." Asked whether he realized the danger, he replied: "You know it is a power line."

Rocco testified that once when he was on the harvester

lifting the wires he received a shock. He told Polander and, on the return trip, Polander stationed both Rocco and Dowden on the harvester to lift the wires. On another occasion Dowden lifted the wires too fast and the board broke causing two of the wires to contact and creating a flash. Polander was driving the truck at the time, and Rocco shouted at him, informing him of the occurrence. A former employee named Miller testified that once he was about to fashion a wooden "T" to lift the wires but Polander indicated that the straight board was adequate. Polander did not deny any of this testimony.

Petitioners' claim of serious and wilful misconduct was premised on two theories: First, that the employer had breached Industrial Safety Order No. 2603 (Cal.Adm.Code, tit. 8, § 2603) of the Department of Industrial Relations, and second, that the employer had subjected his employee to a dangerous situation. The commission rejected the claim.

█ Appellate courts will not disturb Industrial Accident Commission findings of fact which are supported by any evidence. (*Gonzales* v. *Industrial Acc. Com.*, 50 Cal.2d 360, 364 [325 P.2d 993].) █ A claim of serious and wilful misconduct raises issues of law as well as of fact. Issues relating to the credibility of witnesses, the persuasiveness or weight of evidence, and the resolution of conflicting inferences are questions of fact. "But as to what minimum factual elements must be proven in order to constitute serious and wilful misconduct, and the sufficiency of the evidence to that end, the questions are of law." (*Mercer-Fraser Co.* v. *Industrial Acc. Com.*, 40 Cal.2d 102, 115 [251 P.2d 955].) Petitioners assert that the commission has erroneously construed the law and that its findings are without evidentiary support.

In a general way, Safety Order No. 2603 prohibits employers from requiring employees to work in proximity to high voltage lines and prohibits movement of equipment within 6 feet of such lines unless described safety procedures are followed. In Labor Code section 4553.1, adopted in 1959, the Legislature has specified with some precision the findings which are indispensable to an award for serious and wilful misconduct based upon safety order violations. Among these is knowledge of the safety order.[1] The commission found

---

[1]Labor Code section 4553.1 provides in part:

"In order to support a holding of serious and willful misconduct by an employer based upon violation of a safety order, the commission must specifically find:

"(1) That the safety order was established as having been known to

specifically that Polander, the employer, had no knowledge of any safety order applicable to the work. Petitioners argue that Polander knew of a prohibition against operation of cranes within 6 feet of high voltage lines; hence comparable knowledge of a like prohibition in the transportation of a harvester should be imputed to him; that the commission's refusal to impute knowledge is unreasonable in view of the direction for liberal construction and resolution of doubts in the employee's favor. (Lab. Code, § 3202; *Madin* v. *Industrial Acc. Com.*, 46 Cal.2d 90, 93 [292 P.2d 892].)

■ An award for serious and wilful misconduct is "of the nature of a penalty." Such an award can be sustained only if the evidence establishes and the commission finds every fact essential to its imposition. (*Mercer-Fraser Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d at p. 108.) Here the commission has found that the employer was unaware of the safety order invoked by the claimants. There are some areas of the law in which the courts will impute knowledge or impose constructive knowledge in order to prevent unjust results. (See Civ. Code, § 19; *Hayward L. & I. Co.* v. *Orondo Mines,* 34 Cal.App.2d 697, 703 [94 P.2d 380].) ■ In section 4553.1, however, the Legislature has used the word "known" in the sense of actual awareness. There is nothing in the statute to justify the belief that the Legislature was speaking in terms of imputed or constructive awareness. (Cf. *Mason* v. *Case,* 220 Cal.App.2d 170, 180-181 [33 Cal.Rptr. 710].) ■ To be sure, the statute relieves an employer from the burden of ascertaining what safety orders apply to his business. It rewards his ignorance and penalizes his knowledge. Nevertheless, such is the legislative choice. What the statute requires is knowledge in fact of a particular safety order. ■ The evidence here did not establish such knowledge on the employer's part. Rather it established his ignorance. Because of his ignorance, the statute prohibits an augmented award based on safety order violation. (See *Wolters* v. *Industrial Acc. Com., post,* at p. 143 [35 Cal.Rptr. 549].)

As to the second basis for the claim, the commission made the following finding: "Defendant employer did not deliberately act for the express purpose of injuring employee or intentionally perform an act with knowledge that serious injury was a probable result or with a positive, wanton, reck-

---

a particular identified and named person or persons, either the employer or a representative of the employer designated by section 4553; ...''

■

less and absolute disregard of its possibly damaging consequences.'' This finding is modeled after the definition of ''serious and wilful misconduct'' in *Mercer-Fraser Co.* v. *Industrial Acc. Com., supra.* In that case the Supreme Court rejected the notion that serious and wilful misconduct is the equivalent of negligence or even gross negligence. Serious and wilful misconduct, said the court, is ''an act deliberately done for the express purpose of injuring another, or intentionally performed either with knowledge that serious injury is a probable result or with a positive, active, wanton, reckless and absolute disregard of its possibly damaging consequences. ...'' (40 Cal.2d at p. 120.)

The commission's finding in this case apparently rests on Polander's disclaimer of knowledge of the danger. This view of the finding is supported by the commission's opinion, which preceded the finding. The opinion stated: ''As to the second cause of action, there is no evidence to establish that the defendant employer knew of the danger involved. The employer did not order decedent to stand in the place where the accident happened[2] and did not feel that the operation was dangerous. The Panel is of the opinion that defendant employer did not intentionally place said employee in a place of danger with a knowledge that serious injury was a probable result. (*Mercer-Fraser Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 102 [251 P.2d 955, 18 C.C.C. 3].)''

The *Mercer-Fraser* decision poses three alternative bases for a charge of serious and wilful misconduct: (a) a deliberate act for the purpose of injuring another; (b) an intentional act with knowledge that serious injury is a probable result; or (c) an intentional act with a positive and reckless disregard of its possible consequences. All three alternatives require some awareness of danger on the employer's part. Thus in *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.,* 40 Cal.2d 656, at page 663 [255 P.2d 431], it is said that ''reckless disregard'' must be more culpable than carelessness or even gross carelessness; it must be an *affirmative and knowing* disregard of the consequences. *Keeley* v. *Industrial Acc.*

---

[2]This statement in the commission's opinion conflicts with the report of its referee. The latter states: ''The witness [Polander] specifically told deceased where to stand on the harvester forward of the elevator.'' Polander had testified: ''When I went to go up there, he was to go on the front of the harvester where I advised him to go, and I didn't particularly see where he was, the position. The harvester sets up high. I gave him orders to be on the front of the harvester, and I naturally figured he was there.''

*Com.*, 55 Cal.2d 261, at page 268 [10 Cal.Rptr. 636, 359 P.2d 34], emphasizes that serious and wilful misconduct cannot be found from the existence of a danger which the employer would have known had he put his mind to it; the act or omission must be one to which he *has* put his mind; if he intentionally places his employee in a position of *known and obvious* danger without taking any precautions for his safety, a finding of serious and wilful misconduct is justified.

The concept of serious and wilful misconduct thus finds expression in a series of verbal equivalents which become standards for the adjudication of concrete cases. All these formulae share a common theme, which is a relationship between varying degrees of danger and varying levels of awareness. Danger—itself nothing more than a prediction—may be actual, probable or only possible. Awareness of danger ranges from ignorance, through heightening levels of recognition, culminating in complete knowledge. Such terms as: gross carelessness, wanton and reckless disregard, affirmative and knowing disregard, known and obvious danger, danger to which he has put his mind, are descriptions of this shifting relationship made by the adjudicating tribunal. This kind of qualitative judgment involves the sufficiency of the evidence to meet the minimum factual elements necessary to constitute serious and wilful misconduct, which is a question of law open to judicial review. (*Mercer-Fraser Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d at p. 115.)

The necessity of actual (as contrasted with imputed or constructive) knowledge of peril is not entirely clear from the decisions. Both *Mercer-Fraser* and *Hawaiian Pineapple* refer with approval to earlier judicial definitions of ''wilful misconduct'' in the motor vehicle guest law. These definitions permit either actual knowledge of the peril ''or that which in law is deemed to be the equivalent of actual knowledge ....'' (*Hawaiian Pineapple Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d at p. 662; *Mercer-Fraser Co.* v. *Industrial Acc. Com., supra,* 40 Cal.2d at p. 117.) Arguably, such definitions imply that the Industrial Accident Commission or reviewing court may impute to the employer some kind of constructive or fictitious knowledge as an expression of the tribunal's moral reaction to grossly culpable conduct. This implication is rebutted by the Supreme Court's repeated insistence on an act or omission to which the employer has put his mind. (*Keeley* v. *Industrial Acc. Com., supra,* 55 Cal.2d at p. 267; *Hawaiian Pineapple Co.* v. *Industrial Acc. Com.,*

*supra,* 40 Cal.2d at p. 663.) There is a seeming conflict between the Supreme Court's insistence on actual awareness of danger and its proferred alternative of something which the law deems "equivalent" to knowledge. (See Comment, *Serious and Wilful Misconduct Under the California Workmen's Compensation Act,* 42 Cal.L.Rev. 852.)

The real significance of these seemingly discordant notions seems to be this: In dealing with knowledge of danger, the trier is probing into the condition of the employer's mind at a given time. From one standpoint the employer is the best if not the exclusive exponent of his own percipience; no one may gainsay his testimonial description of his own awareness or ignorance. Yet the facts may belie his declarations. Past warnings, past experiences, may arouse premonitions of peril which no sensible person may ignore. The employer will not be heard to deny lessons of the past which all honest men will acknowledge. When he sends his employee into a position of danger which is apparent to others, he will not be permitted to escape liability by professing internal ignorance. Essentially, then, the problem is reduced to a consideration of the kind of evidence an astute and skeptical trier of fact will accept in measuring the employer's consciousness of danger. Circumstantial evidence may justify or even compel a finding of knowledge in the face of testimony avowing ignorance.[3]

In this case the commission has found that the employer did not intentionally act "with a positive, wanton, reckless and absolute disregard of [his action's] possibly damaging consequences." This finding rests on Polander's disclaimer, such as it was, of knowledge of danger. As the commission's opinion stated, Polander did not "feel" that the operation was dangerous—at least when he was on the witness stand.

Polander's testimony on this score was that he believed the

---

[3]State of mind or intent is frequently a crucial issue in legal proceedings. On occasion the actor's description of his past state of mind is admitted as proof of that fact. (See *Watenpaugh* v. *State Teachers' Retirement System,* 51 Cal.2d 675, 679 [336 P.2d 165]; Witkin, Cal. Evidence, §§ 173, 265; 2 Wigmore on Evidence (3d ed. § 581.) But knowledge, state of mind or intent may be proven circumstantially, either by evidence of external circumstances or by evidence of conduct. (Witkin, *op. cit., supra,* §§ 157-158; 2 Wigmore, *op. cit., supra,* §§ 244-293.) Historically, the courts have recognized the danger inherent in permitting an interested person to describe his own state of mind as he pleases. (2 Wigmore, *op. cit., supra,* § 580.) While modern rules of evidence seldom reject such declarations, the caution should persist.

procedure was "not dangerous if it were done right to my knowledge." In part this statement was an ostensible description of his past state of mind. Integrally attached to it was a proviso manufactured by the witness himself. The activity, he said, had to be "done right." Otherwise, it might be inferred, there was danger. What was right, what not right, were conjectural matters left to lie in the unplumbed depths of the witness' mind. Perhaps the proof of the pudding was in the eating; if nobody was electrocuted the performance was "done right." In short, Polander's conditional statement was not a factual recital of his state of awareness at all. There is an area of testimony in which fact and opinion are hardly distinguishable. (See Witkin, *op. cit. supra,* § 169; 7 Wigmore, *op. cit. supra,* § 1919.) Polander's statement does not even approach this area, being entirely in the realm of opinion or argument. Only by breaking his statements into disconnected fragments can any of it be viewed as a factual statement of unawareness. In composite, it was nothing but his opinion at the time he took the witness stand, a bland characterization whose worth was to be measured against his admitted knowledge of power lines and the uncontradicted evidence of known mishaps and close escapes. If acceptance or rejection of such "testimony" turned on an appraisal of credibility, the determination would be within the commission's exclusive province, beyond the scope of judicial review. (*Keeley* v. *Industrial Acc. Com., supra,* 55 Cal. 2d at p. 265; *Industrial Indem. Co.* v. *Industrial Acc. Com.,* 115 Cal.App.2d 684, 692 [252 P.2d 649].) Here the determination does not turn on credibility. There is no occasion for weighing Polander's disclaimer of knowledge because it is not testimony, not evidence, and has no weight at all.

The commission's opinion states that there is no evidence to establish Polander's knowledge of the danger. This statement is incorrect. There was uncontroverted testimony of two occasions when movement of the harvester beneath the power lines created an electrical flash or electrical shock. Polander was present on both occasions. As a result of one such incident, he had two men, rather than one, lift wires, but for one trip only. According to Polander's retrospective characterization, these previous movements had been accomplished without any "trouble"; nevertheless, he did not deny his personal participation in and knowledge of these earlier accidents. He had instructed Dowden to be careful because, as he said, "You know it is a power line." All this evidence was

to be weighed in the balance with the opposing evidence, *if any*, in reaching a finding for or against awareness of danger.

Even if the employer had disclaimed awareness in unequivocal terms, yet circumstantial evidence might justify rejection of his disclaimer. Apparently, in its interpretation of the *Mercer-Fraser* rule, the commission believes that if the employer persists in denying danger despite earlier accidents, the commission must perforce find against serious and wilful misconduct. We do not so interpret *Mercer-Fraser*. Circumstantial evidence, as we have said, may justify or even compel a finding of awareness of danger in the face of testimony avowing ignorance.

Finally, claimants urge Polander's violation of Penal Code section 385 as a ground of serious and wilful misconduct.[4] Claimants argue that Polander is charged with knowledge of the statute, breach of which amounts to serious and wilful misconduct, citing *Parkhurst* v. *Industrial Acc. Com.*, 20 Cal.

---

[4]Penal Code section 385 provides:

"(a) The term 'high voltage' as used in this section means a voltage in excess of 750 volts, measured between conductors or measured between the conductor and the ground.

"The term 'overhead conductor' as used in this section means any electrical conductor (either bare or insulated) installed above the ground except such conductors as are enclosed in iron pipe or other metal covering of equal strength.

"(b) Any person who either personally or through an employee or agent, or as an employee or agent of another, operates, places, erects or moves any tools, machinery, equipment, material, building or structure within six feet of a high voltage overhead conductor is guilty of a misdemeanor.

"(c) It shall be a misdemeanor to own, operate or to employ any person to operate, any crane, derrick, power shovel, drilling rig, hay loader, hay stacker, pile driver, or similar apparatus, any part of which is capable of vertical, lateral or swinging motion, unless there is posted and maintained in plain view of the operator thereof, a durable warning sign legible at 12 feet, reading: 'Unlawful to operate this equipment within six feet of high voltage lines.'

"Each day's failure to post or maintain such sign shall constitute a separate violation.

"(d) The provisions of this section shall not apply to (1) the construction, reconstruction, operation or maintenance of any high voltage overhead conductor, or its supporting structures or appurtenances by persons authorized by the owner, or (2) the operation of standard rail equipment which is normally used in the transportation of freight or passengers, or the operation of relief trains or other emergency railroad equipment by persons authorized by the owner, or (3) any construction, reconstruction, operation or maintenance of any overhead structures covered by the rules for overhead line construction prescribed by the Public Utilities Commission of the State of California."

2d 826, 830 [129 P.2d 113]. The *Parkhurst* case antedates *Mercer-Fraser*, but was not expressly overruled by it. Neither *Mercer-Fraser* nor its successors pass upon violations of safety statutes as an element of serious and wilful misconduct. The *Mercer-Fraser* decision, however, expresses the notion that wilful misconduct requires intentional misconduct, possibly implying a need for actual knowledge of the statute. (See Comment, 42 Cal.L.Rev. at pp. 860-861.) Curiously enough, Labor Code section 4553.1 delineates the role of administrative safety orders in some detail but neglects mention of safety statutes. For the purpose of the present proceeding we note that the commission has made no findings of Polander's knowledge of the statute or his violation of it, although the charge of violation was brought to its attention in a petition for reconsideration. In view of the absence of such findings and because we are remanding the matter to the commission, there is no necessity for our deciding this point.

Insofar as the commission's decision rests on an implied finding that Polander had no knowledge of danger, that finding rests on Polander's argument or characterization, but is not supported by any evidence. In concluding that the employer did not act with reckless disregard of possibly damaging consequences, the commission misconceived an essential standard for adjudicating the claim of serious and wilful misconduct. The order denying the claim is annulled and the matter is remanded to the commission for further proceedings.

Pierce, P. J., and Schottky, J., concurred.

The petition of respondent Polander for a rehearing was denied December 31, 1963, and his petition for a hearing by the Supreme Court was denied January 29, 1964.