[Civ. No. 11086.   Third Dist.   Apr. 11, 1966.]

ALVIN E. CLAUSON, Plaintiff, Cross-defendant and Re-
spondent, v. INDUSTRIAL INDEMNITY COMPANY,
Defendant, Cross-complainant and Appellant; CALI-
FORNIA COMPENSATION & FIRE COMPANY et al.,
Cross-defendants and Respondents.

Long & Levit, Bert W. Levit, Victor B. Levit, John B. Hoak and Gregory Archbald for Defendant, Cross-complainant and Appellant.

Cooley, Crowley, Gaither, Godward, Castro & Huddleson, Thomas Hartwell, Leonard & Lyde and Raymond A. Leonard for Plaintiff, Cross-defendant and Respondent, and for Cross-defendants and Respondents.

PIERCE, P. J.—This appeal is by defendant and cross-complainant Industrial Indemnity Company (Industrial) from a judgment which holds Industrial solely liable to plaintiff for the latter's furniture store fire loss in the sum of $52,456.69. Liability was based upon an oral binder held to have been in effect at the time of the fire. A previous fire insurance policy covering the premises, written by cross-defendant California

Compensation & Fire Company (Cal Comp), was specially found by the jury to have been terminated and judgment was for that company. The court directed a verdict (which was returned and judgment entered thereon) in favor of cross-defendant Bryon Erdmann, the insurance broker who acted as agent for plaintiff (the insured) for both insurers.

We disallow contentions (1) that the trial court improperly directed a verdict for Erdmann (2) that erroneous instructions regarding misrepresentation and concealment were given, (3) that Industrial was improperly nonsuited on the second cause of action of its cross-complaint, (4) that Industrial's binder had expired, and (5) that Cal Comp's policy had not been terminated.

The facts are not complicated. Plaintiff Clauson owned a furniture store in Paradise, Butte County. Erdmann, an insurance broker, handled all of his insurance. Through Erdmann a standard commercial block policy of fire insurance was obtained with Cal Comp as insurer. The term for which it was written was from May 17, 1961, to May 17, 1964. Premiums fluctuated, being based upon reported inventory values. In December 1961 the coverage was $60,000.

On December 19, 1961, plaintiff through Nelson, his son-in-law and store manager, asked Erdmann to investigate the possibility of obtaining a "package" policy which would include coverage of loss through business interruption after a fire. That coverage was not included in Cal Comp's policy. During the same phone call he told Erdmann the store inventory had risen and he desired that coverage be increased from $60,000 to $90,000. Erdmann replied that he was "bound" (i.e., covered) for the increased amount. An endorsement was sent to Clauson and Cal Comp was advised.

On December 28, 1961, a representative of Cal Comp telephoned Erdmann's office, stating to one of the latter's employees that the insurer felt that $90,000 would be in excess of its "capacity"[1] for this particular risk and that it wished the coverage to be placed with another company. To give Erdmann an opportunity to obtain other insurance Cal Comp advised it would remain bound until January 8, 1962. Also stated was the insurer's willingness to take half of the desired coverage if another company would assume the other half.

---

[1] "Capacity" is defined as being the extent to which a company with a given amount of assets will give coverage on a particular risk. The limit is fixed internally by each company acting under its own rules.

On January 5, 1962, Erdmann, who had an agency agreement with Industrial, and who had been advised that that company wrote a "package" policy which included both the coverage in Clauson's existing policy and also the business interruption coverage which Clauson desired, phoned Timmermans in Sacramento. Timmermans is the "Property Lines Manager of the Sacramento Division" of Industrial, a position in which underwriting fire insurance coverage is his primary responsibility. All negotiations with Industrial were through Timmermans, and it is conceded he had full authority to act for and bind that company. Two telephone conversations were held between Erdmann and Timmermans that day. We state Timmermans' version: The first conversation was confined to a confirmation by him that his company did write a "package" policy of the type sought, and a statement by Erdmann of the premises sought to be covered. An appointment with Erdmann at the latter's office in Paradise was made for the following Thursday. There was a second conversation later that day. Between calls Timmermans consulted the rate book of the Pacific Fire Rating Bureau. From that authority he learned that although the City of Paradise had just been rerated "better" because of improved fire protection, Clauson's furniture store's rate had actually been increased rather than decreased. Twenty minutes after the first conversation Erdmann phoned again. He told Timmermans that he had discovered that the existing Clauson policy would "expire" on January 8, and since Timmermans' visit was not scheduled until after that date, he asked if Industrial would bind the risk from the 8th. Timmermans at first demurred upon the basis of the discovered increased rating of these premises but finally agreed to a temporary binder pending an investigation.

On January 11 Timmermans and his associate, Richard Holmes, went to Paradise and examined the property. Holmes was a special agent of the underwriting department of Industrial. The two inspected the building. Erdmann joined them. Timmermans had noted that from four to six frame buildings adjoined the Clauson premises and said that additional hazards were presented thereby. He also pointed out defective wiring in Clauson's store which was visible. He told Erdmann Industrial would not be interested in writing a "package" policy. He did not then refuse a standard policy for $90,000. Nor did he cancel or give notice of cancellation of the binder. On the contrary, he told Erdmann: "We will keep this bound

for you as agreed to in our original temporary binder until such time as I can get a copy of the survey as originally agreed upon.'' The two representatives of Industrial returned to Sacramento where Timmermans sought the survey of the Pacific Fire Rating Bureau. It was made available to him on the following Tuesday, January 16. As a result of facts determined by this survey, Timmermans that same day wrote a memorandum to Erdmann. In it he asked that Industrial's coverage be ''replaced.'' This memorandum was received by Erdmann on January 18. The fire occurred at 10:30 p.m. that night. No replacement of coverage had been obtained before the fire.

Meanwhile, on December 29, 1961, Erdmann had sent a memorandum to Cal Comp acknowledging that the latter would be bound under its policy only until January 8, 1962, upon which date that insurer's liability would cease and the policy would be picked up and sent in for a pro rata cancellation. On January 15, 1962, Cal Comp wrote Erdmann, asking why its policy had not been returned and asking when it might expect to receive it. On January 17 Erdmann replied that the insured was presently bound with another company; that there was a possibility, however, that that company might wish to avail itself of Cal Comp's previously expressed willingness to divide the coverage. Erdmann stated Cal Comp would be advised shortly.

### Re: *The Contention that Erdmann Misrepresented or Concealed a Material Fact.*

Although as originally pleaded and even when the trial began, Industrial's position had been that Erdmann and Clauson had intentionally, wilfully and fraudulently concealed from Industrial the existence of fire hazards known to them and unknown to Industrial—all contentions based upon intentional fraud were abandoned during the trial. Then and now Industrial relies solely upon Erdmann's misuse of the word ''expire'' in his conversation with Timmermans on January 5. It relies upon this (1) as entitling Industrial to have the question of Erdmann's liability go to the jury, (2) as causing error when the court instructed the jury that ''one cannot be guilty of fraudulent concealment of that of which he has no knowledge,'' and (3) as constituting error when the court granted a nonsuit on Industrial's second cause of action which alleged that Clauson *and* Cal Comp had misrepresented that the latter's policy was ''expiring.''

■ The evidence showed that there is a distinction in the parlance of insurance men between an "expiration" of an insurance policy and its cancellation of other termination. "Expiration" means that the policy has reached the end of the term for which it was written. A policy may also be terminated by either party upon a prescribed statutory notice or by mutual agreement. ■ Erdmann testified that in his conversation of January 5 with Timmermans he told the latter that the existing coverage was "ceasing." (Cal Comp's representative had actually characterized that company's action as "retiring from the risk.") Since the court directed a verdict, we, as a reviewing court, must assume the jury, had it been permitted to, would have accepted Timmermans' testimony that Erdmann told him the existing coverage was "expiring."

If this was a misstatement material to Industrial's assumption of the risk, then at least in connection with Industrial's first contention we would have to find error in the trial court's direction of a verdict in Erdmann's favor. ■ Erdmann was Industrial's agent and therefore had the status of a fiduciary towards it with a duty of good faith and loyalty (see 2 Cal.Jur.2d, Agency, § 104, p. 771, and cases cited), and if an agent negligently induces an insurer to assume insurance coverage on which it suffers a loss, the agent is liable. (4 Couch on Insurance 2d, § 26 :343, p. 288.)

■ The test of the propriety of granting a directed verdict is the same as that involved when a nonsuit is granted. (*Estate of Caspar,* 172 Cal. 147, 149-150 [155 P. 631].) Neither may be granted unless there is a lack of substantial evidence supporting appellant's case, and its evidence must be given all the value to which it is legally entitled, including every legitimate inference which may be drawn therefrom. (*Meyer* v. *Blackman,* 59 Cal.2d 668, 671 [31 Cal.Rptr. 36, 381 P.2d 916].)

■ As regards the function of a reviewing court in considering an appeal from a judgment of nonsuit (or one following a directed verdict), it "must view the evidence as though judgment had gone in favor of the appellant and order a reversal if such judgment could be sustained. [Citation.]" (*Guillory* v. *American President Lines, Ltd.,* 230 Cal. App.2d 296, 302 [40 Cal.Rptr. 796].)

We have read the record with these rules in mind. Industrial argues that there was substantial evidence to support a jury verdict holding Erdmann because Timmermans testified he would not have given an oral binder had he known the true

circumstances of the cancellation of the Cal Comp policy. We cannot agree.

As the court stated (per Justice Bray) in *Guillory* v. *American President Lines, supra,* at page 302: " '[B]efore a judgment of nonsuit can be disturbed, *there must be some substance to plaintiff's evidence upon which reasonable minds could differ;* ...' " (Italics supplied.) ▮ Therefore, the mere fact that Industrial's agent Timmermans *stated* that Erdmann's misuse of the word "expire" was material to the issuance of the oral binder does not necessarily make it so and does not necessarily even make it *substantial* evidence. If it can be said from the whole record that reasonable minds must concur that the statement, in spite of Timmermans' protestation to the contrary, was *not* material and that the evidence was *not* substantial, then the trial court properly took the issue from the **jury.**

Insurance Code section 334 provides: "Materiality is to be determined not by the event, but solely by the probable and reasonable influence of the facts upon the party to whom the communication is due, in forming his estimate of the disadvantages of the proposed contract, or in making his inquiries." It appeared in evidence without real conflict that three factors are material to a fire underwriter's (and thus his company's) determination as to whether a specific risk will, or will not be, assumed and a fire insurance policy written (or binder given): (1) the moral hazard; (2) the physical hazard; and (3) the issuing company's "capacity." (See fn. 1.) (Although Timmermans in his testimony stated there were "many other factors" to be considered, it was obvious, when he was asked to enumerate these other factors, that all of them came within the category of either moral or physical hazards. He referred, for example, to "overinsurance" and "previous fire losses.")

As regards the factor of moral hazard, he admitted it was nonexistent in this case.[2] He also conceded there had been no misrepresentation or concealment as to any physical hazard.[3] As regards the question of "capacity," he made it clear that if his was to be the only company on the risk he would not be interested in the "capacity" of another company which had

---

[2]He testified: "Q. Did you have any reason to believe that there was any question concerning the moral hazard? A. No, there was no question of that. Q. No question of concealment or misrepresentation on the moral hazard? A. No, sir."

[3]He testified: "Q. [There was] no question of concealment or misrepresentation of the physical hazard? A. No, sir."

previously been on the risk.[4] Seemingly, in contradiction to that statement, Timmermans testified elsewhere that he *would* be interested in the capacity of the company previously carrying the insurance but on cross-examination it became obvious that this would only be in a situation where the previous company was canceling or reducing the previous policy because of some moral or physical hazard *and a professed lack of "capacity" was being given as an excuse*. In that case, he testified he would want to investigate the property and ascertain if there was some reason why the previous insurer was getting off the risk. There was no such situation here. Cal Comp was neither attempting to cancel nor to reduce the insurance coverage as such coverage had originally been written. The insured and not the insurer had been the active party seeking a change in coverage. First, he wanted a type of additional coverage—business loss—which Cal Comp apparently did not write, and secondly, he wanted *additional* coverage which Cal Comp felt a lack of "capacity" prevented it from assuming. The lack of "capacity" was no pretext; it was real.

Moreover, by *acts* as well as words, Industrial demonstrated that Erdmann's misuse of the word "expire" was immaterial. All that Timmermans ever contended was that knowledge of the true situation as regards the circumstances of the cancellation of the Cal Comp policy would have caused him to "go to the locale and determine all the factors." Here he did investigate immediately after issuing the binder, and even after doing so and learning that which he now states would have caused him to *refuse* to bind, he expressly continued the binder in effect. He and his associate had visited the premises knowing of its uprating; they inspected the premises and observed defective wiring; they inspected the neighborhood, finding additional physical hazards there. Notice of termination of the binder could have been given then and there. (We will discuss this below.) Instead, Timmermans agreed when he left the premises that the binder would continue in effect—at least until the Pacific Fire Rating Bureau's survey had been examined.

Although the testimony of a witness as to his own state of mind is admissible, circumstantial evidence, as this court had occasion recently to state, per Justice Friedman, in *Dowden* v.

---

[4]He testified: "Q. And you were not interested in the capacity of another company? A. Well, not as such, no." He also testified: "And in fact, it is not even material to you to know what another company's capacity is? A. Not if you are the only company on the risk, it is not."

*Industrial Acc. Com.,* 223 Cal.App.2d 124, at page 132 [35 Cal.Rptr. 541], "may justify *or even compel* a finding" contrary to the professed state of mind. (Italics supplied.) (And see footnote 3 on page 132 of the *Dowden* decision, particularly the statement: "Historically, the courts have recognized the danger inherent in permitting an interested person to describe his own state of mind as he pleases. (2 Wigmore, . . . [on Evidence (3d ed.)] § 580.) While modern rules of evidence seldom reject such declarations, the caution should persist.")

We hold there was no substantial evidence that Erdmann's misuse of "expire" had any materiality whatever to Industrial's agreement to be bound and that the trial court properly directed a verdict in its favor. The stated conclusion also supports the challenged jury instruction and the nonsuit granted on the second cause of action.

*Re: The Contention that Industrial's Binder Expired of its own Terms or When Timmermans' Memo Reached Erdmann.*

■ Because, according to Timmermans, Industrial's oral binder was stated in the following terms, "Well, I will bind this for you and I will issue a temporary binder for you until I can come up and inspect the premises personally, and also that we can get a copy of the survey from the rating bureau and determine exactly what the cause of the rate increase instead of the decrease is," it is urged that Industrial's binder had already expired "by its own terms" before the fire loss occurred. But the language quoted does not permit that interpretation. All that it reasonably can be said to mean is this: that Industrial is binding the risk temporarily until after it investigates the risk; it shall then determine whether or not it wishes to issue a policy. If it does, the policy issued will supersede the binder; if it does not, Industrial will then take steps to terminate the binder. And that is the way Industrial itself interpreted the binder, as shown both by Timmermans' testimony and his subsequent acts.

Timmermans, on cross-examination, conceded: That ordinarily a binder will be either for a fixed date or period certain or until a reasonable notice has been given; that he (and therefore Industrial) knew that the binder given in this case followed the termination of the only policy of fire insurance covering Clauson's premises; that the purpose of a binder is to provide protection while things are worked out; that "it would be against the grain normally [for] an insurance com-

pany to . . . pull the rug out,'' leaving the property owner uninsured; that when a company which has issued a temporary binder decides it does not wish to write a policy the normal procedure is for it to give reasonable notice so that the insured or his broker will have an opportunity to replace coverage. He also was aware it would be difficult for a broker to obtain such replacement within a few hours. He offered no explanation of any intent to depart from the normal procedure in this case. And it is clear there was no such intent. As it was stated, the binder did not expire either on a date or contingency certain.

Moreover, when Industrial finally did decide to terminate the binder the instrument stating that determination did not contemplate an immediate termination. In the memorandum of January 16 written by Timmermans to Erdmann it was stated: ''I know that you will agree with me By [Erdmann's nickname] that under the circumstances we should be relieved of liability under our binder. I would appreciate your write [*sic*] me immediately that our liability has been *replaced.* Thanks.'' (Italics supplied.) Timmermans testified, stating his understanding of the meaning of the word ''replaced'': ''Q. Now, isn't it correct that the term 'replacement' means to substitute for something which is now existing for something else? A. That would be the normal interpretation.''

Again it is quite apparent that after the loss occurred Timmermans did not *then* consider the binder he had given had already expired. When Erdmann phoned Timmermans and advised him of the fire, the latter stated the matter would be turned over to Industrial's claims department.

We hold that the court correctly instructed the jury that the binder had not expired by its own terms, and we also hold that it correctly ruled that Timmermans' memorandum of January 16, requesting Erdmann to ''replace'' the coverage, was intended to give him a reasonable time so to do, which had not elapsed when the fire occurred. Any other interpretation would be unreasonable. The assertion of the rule contended for would relegate ''binders'' such as this to a status of will-o-the-wisp uncertainty, a consequence as disastrous to insurers as it would be to the insured treated as a class.

The authorities cited by Industrial all involved binders with specified expiration dates or containing a fixed terminating event (e.g., liability insurance during a specific trip as in *Ward* v. *Gregory* (Mo. 1957) 305 S.W.2d 499, or fire insurance

during a hop drying operation as in *Leach* v. *Anderson*, 85 N.Y. 632.) These cases are so obviously distinguishable that no useful purpose could be served by discussing them. Of the California cases cited, *Meadows* v. *Emett & Chandler*, 86 Cal. App.2d 1 [193 P.2d 785], in a footnote definition of "binder" (on p. 7) states that the binder continues " 'until the policy is issued or the risk is declined *and notice thereof given.*' " (Italics supplied.) Similarly, in *Apparel Mfrs. Supply Co.* v. *National Auto. & Cas. Ins. Co.*, 189 Cal.App.2d 443 [11 Cal. Rptr. 380], it was held the binder remained in effect *until notice given.* ▆▆ When no time is specified within which the act called for by a notice must be done, a reasonable time is implied. (See 9 Couch on Insurance 2d, § 39:207, fns. 9, 10, p. 562; see also 7 Williston on Contracts (3d ed.) sec. 920, p. 623.)

### *Re: The Contention that the Cal Comp Policy had Not Terminated.*

As stated above the jury made a special finding that the Cal Comp policy had terminated on January 8. Industrial argues that substantial evidence does not support that finding. We experience some difficulty in following Industrial's argument in this respect. The contention apparently is that there was no termination because Cal Comp entered into a separate loan agreement with Clauson, advancing him money sufficient to meet a portion of his fire loss immediately, or perhaps because Cal Comp on and after December 28, 1961, had been willing to participate in the coverage of a new policy. Or perhaps the claim is based upon the fact that the policy had not been delivered up physically. Whatever the basis of the contention, it is untenable. ▆▆ The facts recited above show there was an unequivocal termination of the Cal Comp policy by mutual agreement. On December 28, 1961, Mr. Lopache of Cal Comp phoned Erdmann that the policy would be cancelled as of January 8. December 29 Erdmann, as Clauson's agent, sent a memorandum to Cal Comp: "[W]e shall consider coverage bound until January 8, 1962, and at that time we will pick up the policy for return and pro/rata cancellation." Timmermans was advised of this on January 5 and replaced the Cal Comp insurance with his binder. The loan made after the loss was a separate transaction. The fact that Cal Comp at all times was willing to accept 50 percent of the coverage on a *new* policy (which was never written) or that the physical act of the surrender of the written instrument was not consummated has

no bearing on the matter. There had been a complete meeting of the minds on the cancellation of the Cal Comp policy. (*Glens Falls Ins. Co.* v. *Founders' Ins. Co.*, 209 Cal.App.2d 157, 168 [25 Cal.Rptr. 753, 3 A.L.R.3d 1058].) ·

The judgment is affirmed.

Friedman, J., and Bray, J.,* concurred.

A petition for a rehearing was denied May 3, 1966, and appellant's petition for a hearing by the Supreme Court was denied June 8, 1966.

*Retired Presiding Justice of the District Court of Appeal sitting under assignment by the Chairman of the Judicial Council.