[S. F. No. 22691. In Bank. Jan. 15, 1970.]

PARAMOUNT PROPERTIES COMPANY, Plaintiff and Appellant, v. TRANSAMERICA TITLE INSURANCE COMPANY, Defendant and Respondent.

COUNSEL

Haizlip, Ring, O'Donnell & Moore and David D. Ring for Plaintiff and Appellant.

Tobin & Tobin and John J. Hopkins for Defendant and Respondent.

OPINION

TOBRINER, J.—Paramount Properties Company, a commercial lender (hereinafter designated Paramount), filed suit against the Transamerica Title Insurance Company seeking the reimbursement of expenses incurred in the defense of a lawsuit. Paramount claims that the provisions of two insurance policies which the title insurance company had issued to it required the company to defend it in litigation involving the validity of two deeds of trust which it held. After a trial without a jury, the superior court, concluding that the insurance company was not obligated to provide such a defense, entered judgment in favor of defendant. This appeal by plaintiff Paramount followed. The case raises the issue of the proper construction of several provisions of the standard lender's title insurance policy.

On December 12, 1963, plaintiff lent $35,000 to Oscar Holmberg and received a promissory note secured by a deed of trust to two parcels of land located in Contra Costa County and Marin County, respectively. The deed was executed by Holmberg as trustor and named plaintiff as beneficiary; it was recorded in both counties one week later.

On the date of recordation, the City Title Insurance Company[1] issued two separate title insurance policies to plaintiff, one covering the Contra Costa parcel, the other the Marin parcel. By these policies' terms, defendant guaranteed that the trust deed was a valid trust deed on the named properties and insured plaintiff "against loss or damage . . . which the Insured shall sustain by reason of . . . any defect in the execution of" the trust deed. Paragraph 3(d)(2) of the policy excluded from this general coverage "defects . . . known to the Insured either at the date of this policy or at the date such Insured acquired an estate or interest insured by this policy and not shown by the public records . . . ." Defendant also agreed to defend, at its own expense, any action against plaintiff founded upon a claim that the trust deed was not a valid lien, prior to all other liens, except those

_____

[1]Defendant Transamerica Title Insurance Company is the successor in interest to City Title Insurance Company and both are referred to hereafter interchangeably as "defendant" or "the title insurance company."

specifically set forth in the title policy.[2] On the last page of each policy under a paragraph headed "Payment of Loss" there appeared paragraph 7(d) which read in part: "Payment in full by any person or voluntary satisfaction or release by the Insured of a mortgage covered by this policy shall terminate all liability of the [title] Company to the insured owner of the indebtedness secured by such mortgage, . . ."[3] No language preceded this last sentence to warn the policyholder that it did not involve payment of loss but *non*-payment of loss.

On April 9, 1964, and April 10, 1964, Lawrence J. Giubbini filed quiet title actions in Contra Costa and Marin Counties, respectively, in connection with the previously mentioned parcels, naming plaintiff as one of the defendants in each action. Giubbini claimed, in substance, that Holmberg and another party, Willer, had induced him to execute and deliver to them the deeds to the two parcels, leaving the name of grantee blank on each deed; Holmberg and Willer allegedly promised to hold the deeds in trust and not to fill in a grantee without Giubbini's consent. Since Giubbini had never given his consent to the execution of the deed to plaintiff, he contended in his action that the trust deed was void, and that he was the owner of the two parcels.

In accordance with its obligations under the title insurance policies, defendant undertook the defense of this action on behalf of plaintiff. During the pendency of this action, Holmberg and Giubbini apparently reached an agreement on at least a temporary settlement; on July 14, 1964, Giubbini paid plaintiff the amount of the indebtedness due to it, i.e., $35,000 plus interest, received a reconveyance of the trust deed and dismissed his action without prejudice. The title insurance company did not inform plaintiff that it would contend that acceptance of the payment effectuated a termination of the policies. By paying off the loan in this manner Giubbini cleared

---

[2]Paragraph 4a of the "Conditions and Stipulations" section of the policies provided: "The Company, at its own cost and without undue delay shall provide (1) for the defense of the Insured in all litigation consisting of actions or proceedings against the Insured . . . which litigation or action in any such events is founded upon an alleged defect, lien or encumbrance insured against by this policy . . . ."

[3]Paragraph 7(d) provided as follows: "All payments under this policy, except payments made for costs, attorneys' fees and expenses, shall reduce the amount of the insurance pro tanto and no payment shall be made without producing this policy for endorsement of such payment unless the policy be lost or destroyed, in which case proof of such loss or destruction shall be furnished to the satisfaction of the Company; provided, however, if the owner of an indebtedness secured by a mortgage shown in Schedule B is an Insured herein then such payments shall not reduce pro tanto the amount of the insurance afforded hereunder as to such Insured, except to the extent that such payments reduce the amount of the indebtedness secured by such mortgage. Payment in full by any person or voluntary satisfaction or release by the Insured of a mortgage covered by this policy shall terminate all liability of the Company to the insured owner of the indebtedness secured by such mortgage, except as provided in paragraph 2 hereof."

record title to the parcels and was able to sell the Contra Costa property. Only two months later, however, on September 22, 1964, Giubbini commenced a new action against Holmberg, Willer and plaintiff seeking to recover the $35,000 plus interest paid in July.

In this second action Giubbini claimed that Paramount's lien was invalid on the identical grounds stated in the original quiet title action. In addition he alleged that although Paramount knew or should have known of the invalidity of the lien, it continued to assert an interest in the title and, as a result, Giubbini claimed that in order to sell the Contra Costa property it was necessary for him to pay the Paramount loan, which he did.[4] The complaint maintained that these facts illustrated that the payment of the loan had been made under duress, and prayed for reimbursement of the payment.

Paramount gave timely notice of the pendency of this new action to the title company and requested that the company undertake the defense. Defendant refused. Thereafter Paramount successfully defended the action itself and then instituted this suit against the title company for the expenses incurred in that defense.

We shall point out that under the proper interpretation of the terms of the insurance policies defendant insurance company was obligated to undertake plaintiff's defense in the second Giubbini lawsuit. As we discuss below, the payment of the debt in the instant case, coupled, as it was, with the commencement of a suit for refund, did not terminate the coverage of the policy. Since the second Giubbini action was grounded on an alleged defect in the title, for which defendant might have been liable, the insurance company should have defended plaintiff and must now reimburse plaintiff for expenses incurred in its own defense.

1. *The provision that the policy "shall terminate" upon "payment in full" of the loan refers to final and unconditional payment.*

Initially we address defendant's primary contention that at the time the September 22 action was commenced defendant was not required to defend plaintiff because the title policies, under which such an obligation

---

[4] An adverse claim to property may of course constitute a substantial cloud on the title and may even render the title unmarketable. Because the maintenance of a quiet title action may involve litigation of considerable duration, an owner who is attempting to sell land may be extremely vulnerable to harassment by persons fraudulently purporting to hold adverse claims. To extricate an owner from this vulnerable position and to aid in the marketability of property, a title claimant is permitted first to pay off an adverse claimant in order to clear title and then subsequently to institute a suit for refund against the allegedly fraudulent claimant on the grounds that the original payment was made under duress. (Cf., e.g., *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195 [1 Cal.Rptr. 12, 347 P.2d 12].)

might arise, had terminated on July 14. Paragraph 7(d) of the policies provides, in part: "payment in full by any person . . . of a mortgage covered by this policy shall terminate all liability of the Company to the insured . . . ." Defendant contends that since the language of this provision is clear and unambiguous, we need not, and should not, resort to the traditional rules for construing ambiguities in insurance contracts against the draftsman of the contracts, the insurance company. Since Giubbini paid plaintiff the full amount due under the note in July, defendant insists coverage clearly ceased at that time.

In the usual case the provision of paragraph 7(d) would operate in a straightforward manner; once a lender has been paid in full he normally no longer has an interest in the title of the underlying security. When a full payment is made but subsequently alleged to have been given under duress and a suit for refund of the payment is instituted, however, the lender is in a completely different position. He no longer is free from concern as to the validity of the supporting security but rather is embroiled in litigation which threatens to recast him as a vulnerable creditor. To determine whether such a "payment followed by a suit for refund" is equivalent to "payment in full" within the meaning of paragraph 7(d), we look first to the purposes behind this language as revealed in the reasonable expectations of the parties. (3 Corbin on Contracts, p. 164.)

In procuring title insurance, a lender seeks to insure himself against the risk that a defect in the underlying title may invalidate his lien and leave him in the status of an unsecured creditor. That risk continues so long as the lender does not receive final and unconditional payment of the loan proceeds. The termination clause of paragraph 7(d) gives no indication of any intention to cut short coverage while the insured's primary risk survived; more reasonably, the provision should be interpreted as designed to reflect the conditions which represent a curtailment of this risk. Once the insured no longer has any interest in the validity of the title, paragraph 7(d) provides that the liability of the insurer ceases. If "full payment" is interpreted to apply to a payment which does not eliminate the insured's risk, then the provision irrationally ties the termination of the policy to an arbitrary and fortuitous occurrence. We do not think such an interpretation is in accord with the reasonable expectations of the parties.

In the circumstances of the instant case it is clear that the initial payment by Giubbini did not terminate plaintiff's interest in the security nor its need for protection against title defects. If Giubbini had been successful in his second suit, Paramount would have been obligated to return the payment and plaintiff's lien on the parcels would have been invalidated, rendering plaintiff an unsecured creditor of Holmberg. This eventuality

is precisely the risk against which plaintiff could reasonably expect its title insurance would protect. Thus, even under generally applicable rules of contract interpretation, we conclude that in light of the reasonable expectations of the parties the term "payment" must reasonably be construed to encompass only final or unconditional payments, i.e., payments which in fact terminate the insured's risk connected with the validity of the title.

The above interpretation of the provision is reinforced, of course, by the deeply ingrained principles governing the interpretation of insurance contracts. ■ If policy provisions are susceptible to alternative readings, doubts are resolved against the insurer. (See, e.g., *Gray* v. *Zurich Ins. Co.*, 65 Cal.2d 263, 269 & fn. 3 [54 Cal.Rptr. 104, 419 P.2d 168].) ■ "If semantically permissible, the contract will be given such construction as will fairly achieve its object of securing indemnity to the insured for the losses to which the insurance relates." (*Continental Cas. Co.* v. *Phoenix Constr. Co.* (1956) 46 Cal.2d 423, 437 [296 P.2d 801, 57 A.L.R.2d 914].)

■ In particular, provisions relating to exclusions or exceptions from the performance of the basic, underlying obligation are construed strictly against the insurer and liberally in favor of the insured. (See *Brinkmann* v. *Liberty Mut. Fire Ins. Co.* (1965) 63 Cal.2d 41, 45 [45 Cal.Rptr. 8, 403 P.2d 136]; *Freedman* v. *Queen Ins. Co. of America* (1961) 56 Cal. 2d 454, 457 [15 Cal.Rptr. 69, 364 P.2d 245].) Termination provisions which purport to curtail the insurer's liability in a manner inconsistent with the insured's reasonable expectations are closely analogous to exclusionary provisions; in both cases the insurer attempts to carve out an area of non-coverage in a manner which does not clearly and adequately apprise the insured of the consequences. In interpreting such termination provisions, we believe that the principles of construction for exclusionary provisions are applicable. (*Hanover Ins. Co.* v. *Haney* (1968) 221 Tenn. 148 [425 S.W.2d 590, 592]; *Miller* v. *Lawyers Title Ins. Corp.* (E.D.Va. 1953) 112 F.Supp. 221, 226-227; cf. *Clauson* v. *Industrial Indem. Co.* (1966) 241 Cal.App.2d 440, 448-449 [50 Cal.Rptr. 615].)

■ Thus, to be effective, a termination provision must be "conspicuous, plain and clear." (See *Steven* v. *Fidelity & Cas. Co.* (1962) 58 Cal.2d 862, 878 [27 Cal.Rptr. 172, 377 P.2d 284].) ■ The provision relied on by the insurance company in the instant case lies near the bottom of the insurance policy's second page of fine print in type approximately one-sixteenth of an inch high. The "termination" provision appears at the end of a paragraph within a section of the policy entitled, in large print, "Payment of Loss."[5] The other provisions in this section deal generally

---

[5] Paragraph 7(d) is set out in footnote 3, *supra*.

with the consequences of payment by the insurance company for losses incurred by the insured. Nothing in the provision brings to the insured's attention the fact that the "termination" language involves payment received from some third party. ■ Our characterization of the exclusionary provision at issue in *Gray* v. *Zurich Ins. Co., supra,* 65 Cal.2d 263, 273, applies to the clause before the court in the case at bar: "This clause is not 'conspicuous' since it appears only after a long and complicated page of fine print, and is itself in fine print; its relation to the remaining clauses of the policy and its effect are surely not 'plain and clear.' "

■ Particularly in light of this doctrinal background, we conclude that the July 12 payment to plaintiff did not terminate defendant's obligations under the policy. "[T]he courts in the field of insurance contracts have tended to require that the insurer render the basic insurance protection which it has held out to the insured." (*Gray* v. *Zurich Ins. Co., supra,* 65 Cal.2d 263, 280.)

2. *The insurance company was obligated to defend the second suit because the facts underlying the action indicated the company's potential liability.*

■ Defendant contends further, however, that even if the policy were in effect in September, it was not obligated to defend the suit because Giubbini's second claim was excluded from coverage by paragraph 3(d) of the policy. Paragraph 3(d) excludes coverage for "[d]efects . . . known to the Insured either at the date of this policy or at the date such Insured acquired an . . . interest insured by this policy . . . ."[6] Since the second Giubbini lawsuit rested in part on an allegation that Paramount accepted the payment of debt by Giubbini at a time when it knew or should have known that its title was defective, the title company maintains that this "guilty knowledge" of Paramount brings the Giubbini claim within the exception of paragraph 3(d) and excuses the insurer from its duty to defend. We set forth our reasons for rejecting this defense.

■ As we stated in *Gray* v. *Zurich Ins. Co.* (1966) 65 Cal.2d 263, 276-277 [54 Cal.Rptr. 104, 419 P.2d 168], we do not, in analyzing the insurer's duty to defend, look merely to the language of the complaint

---

[6]Paragraph 3(d) provided in full: "This policy does not insure against loss or damage by reason of the following: . . . (d) Defects, liens, encumbrances, adverse claims against the title as insured or other matters (1) created, suffered, assumed or agreed to by the Insured; or (2) known to the Insured either at the date of this policy or at the date such Insured acquired an estate or interest insured by this policy and not shown by the public records, unless disclosure thereof in writing by the Insured shall have been made to the Company prior to the date of this policy; or (3) resulting in no loss to the Insured; or (4) attaching or created subsequent to the date hereof."

filed against the insured. "Defendant cannot construct a formal fortress of the third party's pleadings and retreat behind its walls. . . . Since modern procedural rules focus on the facts of a case rather than the theory of recovery in the complaint, the duty to defend should be fixed by the facts which the insurer learns from the complaint, the insured, or other sources. *An insurer, therefore, bears a duty to defend its insured whenever it ascertains facts which give rise to the potential of liability* under the policy." (Italics added.) (See also *Davidson* v. *Welch* (1969) 270 Cal. App.2d 220, 233-234 [75 Cal.Rptr. 676].)

The facts disclosed by the second Giubbini complaint clearly created the possibility that the insurer would be liable for the claim. Paragraph 3(d) of the insurance policy applies only to plaintiff's actual knowledge as of *December 12, 1963,* when Paramount received the trust deed, or as of *December 19, 1963,* when the title insurance policies were issued. The second Giubbini suit put in issue only what Paramount knew or should have known on *July 14, 1964,* when it continued to assert its interest in the property and accepted the payment alleged to have been made under duress. (See *Leeper* v. *Beltrami* (1959) 53 Cal.2d 195, 204, 206 [1 Cal. Rptr. 12, 347 P.2d 12]; *McNichols* v. *Nelson Valley Bldg. Co.* (1950) 97 Cal.App.2d 721, 722-723 [218 P.2d 789].) Paramount naturally knew more in July 1964 than in December 1963, having been served in April 1964 with the complaint in the quiet title action which alleged in detail a defect in Holmberg's title. By the terms of paragraph 3(d), knowledge acquired by the insured after the issuance of the policy clearly would not preclude coverage.

Thus the title company would have been liable for damages accruing under this second action if (1) Holmberg's title was defective, (2) plaintiff did not know of this defect at the time the title insurance policy was issued and (3) Giubbini's payment was determined to have been made under duress and Paramount was required to return it—factual circumstances clearly consistent with the facts underlying the second Giubbini lawsuit. Defendant therefore bore a clear duty to defend the lawsuit as requested.[7] Since defendant failed to defend the suit, it is liable for the resulting litigation

---

[7]The fact that Giubbini's suit involved the issue of whether Paramount knew or should have known of the defect as well as the issue of the lien's validity, of course, does not relieve the insurer of its duty to defend. Whenever a possible defect in the title is one essential issue in the suit, the action is interpreted as "founded upon an alleged defect" and the insurer's obligation to represent the insured attaches. (Cf. *Blackfield* v. *Underwriters at Lloyd's London* (1966) 245 Cal.App.2d 271, 275 [53 Cal.Rptr. 838]; *Firco, Inc.* v. *Fireman's Fund Ins. Co.* (1959) 173 Cal.App.2d 524, 529 [343 P.2d 311].)

expenses properly incurred by the insured. (See, e.g., *Arenson* v. *National Auto. & Cas. Ins. Co.* (1955) 45 Cal.2d 81, 84 [286 P.2d 816].)

At the nonjury trial of this action all relevant facts except the amount of plaintiff's legal expenses were submitted on stipulation by the parties. From these stipulated facts incorporated into the trial court's findings, we conclude that the defendant's liability has been established. (See *Industrial Indem. Co.* v. *General Ins. Co.* (1962) 210 Cal.App.2d 352, 362 [26 Cal. Rptr. 568].) The trial court specifically found that the expenses incurred by plaintiff in defending the second Giubbini suit were proximately caused by defendant's refusal to undertake the defense.

■ Plaintiff's attorney introduced evidence, uncontested by defendant, that on November 17, 1966, he sent a statement to defendant requesting payment for fees and costs in the amount of $13,928, and on January 9, 1967, he sent a further statement for additional fees in the amount of $225. Although the trial judge, in light of his decision awarding judgment to defendant, did not render an explicit finding on the amount of recoverable damages, defendant has conceded on appeal that the amount of costs and fees incurred by plaintiff was not unreasonable.

Under Civil Code section 3287[8] a prevailing party is entitled to interest from the date a debt owed him becomes "certain." Since the insurance policy does not fix the date that litigation expenses are payable, the amount of the legal obligation became fixed in the instant case when liability was incurred by Paramount. (See *Overholtzer* v. *Northern Counties Title Ins. Co.* (1953) 116 Cal.App.2d 113 [253 P.2d 116].) We need not decide whether that date was when defendant contracted for the services or when the attorney sent his statement, because plaintiff only claims interest from the latter date, the time of billing, and defendant obviously cannot complain of injury from the designation of this later date.

The judgment is reversed with directions to enter judgment for plaintiff

---

[8]Section 3287 provides in relevant part: "Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day . . . ."

in the amount of $14,153 with interest on $13,928 accrued from November 17, 1966, and interest on $225 accrued from January 9, 1967.

Traynor, C. J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.

**McCOMB, J.**—I dissent. I would affirm the judgment for the reasons expressed by Mr. Justice Agee in the opinion prepared by him for the Court of Appeal in *Paramount Properties Co.* v. *Transamerica Title Ins. Co.* (Cal.App.) 77 Cal.Rptr. 894.

Respondent's petition for a rehearing was denied February 11, 1970. McComb, J., was of the opinion that the petition should be granted.