[No. 3191–2.   Division Two.   July 13, 1978.]

SECURITIES SERVICE, INC., *Respondent,* v. TRANS–
AMERICA TITLE INSURANCE COMPANY,
*Appellant.*

*Orly J. Sorrel* and *Nicolai, Sorrel, Binns & Beck,* for appellant.

*James C. Young* and *Young & Cole, Inc., P.S.,* for respondent.

REED, J.—Transamerica Title Insurance Company (Transamerica) appeals from a judgment in favor of plaintiff, Securities Service, Inc. (Securities) in an action for damages upon a policy of title insurance. Securities cross–appeals. We affirm the judgment but modify the damages awarded by the trial court.

As a part of a complex real estate promotional scheme in Mason County, W & A Development Company (W & A) entered into a contract on August 1, 1971, to sell a piece of land known as the Johnson parcel to a Mr. and Mrs. Shephard for $37,000. The tract was then subject to a $25,000 mortgage in favor of Conrad A. Johnson. The

Shephards, apparently as part of the scheme, simultaneously delivered back to W & A a quitclaim deed to the property; the deed was not immediately recorded.

On or about August 5, 1971, W & A negotiated a sale of the Johnson tract to Securities, and Transamerica issued its preliminary title report. The report showed W & A as owners, subject to the Johnson mortgage and the Shephard contract. On August 9, 1971, W & A executed a deed and seller's assignment of the contract (balance $33,750) to Securities for $27,000 ($23,625 cash, plus $3,375 "hold back" to cover future defaults). On August 10, 1971, Allen Bowden, an attorney and controlling owner of W & A, forged a satisfaction of the Johnson mortgage and placed it on record. On August 11, 1971, Transamerica issued its policy for $27,000, insuring Securities' title to a "fee simple interest" in the property against

loss or damage sustained by reason of:

. . .

(2) Any defect in, or lien or encumbrance on, said title existing at the date hereof, not shown in Schedule B.

Schedule B of the policy listed the Shephard contract as an outstanding interest but made no mention of the Johnson mortgage, the forged satisfaction having been placed of record.

Subsequently the Shephard contract became delinquent, necessitating application of a portion of the "hold back" funds to the overdue payments. About this time Bowden advised Securities that W & A had acquired the Shephard interest. On February 4, 1972, Bowden recorded the Shephard quitclaim deed.

In October 1973, Johnson commenced a mortgage foreclosure suit in Mason County Superior Court seeking a total of $26,393.97, including attorneys fees, and alleging that Securities was guilty of complicity in the forging of the satisfaction, as part of a scheme to defraud Johnson. Securities' attorney, Malcolm Villesvik, tendered defense of this suit to Transamerica, whose attorneys agreed the company would undertake to defend Securities against the Johnson

mortgage foreclosure *but not against any allegations of wrongdoing.* Villesvik was instructed that attorney John Ragan of Shelton would be retained by Transamerica as "co–counsel." Accordingly, Villesvik appeared and answered for Securities. At the same time, he filed cross claims against W & A and Bowden for any damages sustained by Securities should the mortgage satisfaction prove to have been forged and to have the Shephard contract judicially forfeited.

It appears that Villesvik and Earl Phillips, president and legal officer for Securities, were unwilling to believe, at the outset, that Bowden was guilty of forgery. The matter became more complicated when W & A filed pleadings which failed to clearly deny that Securities was involved in the chicanery; these equivocal responses were later withdrawn. Also, for a period of several months all parties were hopeful that certain Japanese interests would provide financing which would solve all of the problems besetting W & A's project, including the Johnson foreclosure. According to Villesvik, Johnson's attorneys were not vigorously pressing the foreclosure suit. It was not until June 1974 that W & A and Bowden filed answers to the Johnson complaint; Villesvik did not file Securities' pleadings until July 27, 1974. Although by June 1974 it appeared that Bowden had very likely forged the satisfaction, it was not until September 1974 that Bowden conceded the fact. At the same time, Johnson admitted he had no proof of Securities' participation in the fraudulent scheme.

Johnson was finally permitted to take a default; judgment was entered on January 10, 1975, for $29,021.04 and the mortgage was foreclosed. Securities was granted judgment against W & A and Bowden for $41,236.61 ($4,400 attorneys fees) and the Shephard contract was forfeited. On January 15, 1975, Villesvik demanded that Transamerica pay Securities its damages of $41,236.61. Transamerica responded that it would pay Securities' actual loss upon presentation of satisfactory proofs, as provided in the policy, and requested a breakdown of attorneys fees. Villesvik

countered with an offer to settle for policy limits of $27,000 plus $3,817.73 for his attorneys fees and costs incurred at the instance of Transamerica. Transamerica renewed its offer to pay its insured's actual loss, which it calculated at $23,931.78, including attorneys fees; this time the offer was coupled with a demand that Securities transfer the Johnson tract to Transamerica pursuant to the policy's subrogation clause. On March 14, 1975, Johnson bid in the parcel at sheriff's sale for the amount of his judgment, with increased costs; the sale was confirmed April 11, 1975. The period of redemption was allowed to expire during the progress of the instant action.

Securities then brought this suit claiming damages in excess of policy limits, alleging that Transamerica had refused, despite its knowledge of the forgery, to clear Securities' title of the Johnson mortgage. Securities also sought punitive damages, attorneys fees and costs. After a trial to the court, findings of fact and conclusions of law were entered to the effect that: (1) Transamerica retained Villesvik to defend Securities against the Johnson mortgage but not the claims of complicity; (2) Transamerica controlled the Mason County litigation, rendering it liable for Villesvik's fees and costs of $3,817.73; (3) Transamerica had a duty to "provide the insured with clear title and remove defects"; (4) Transamerica's decision to exercise its policy option to defend the Johnson foreclosure to judgment, rather than tender its policy limits or satisfy the Johnson claim, was a breach of its duty to clear title and rendered it liable to Securities for the amount required to satisfy the Johnson judgment; (5) Transamerica's decision to defend and its failure to clear title did not result from either negligence or bad faith. The trial court awarded Securities judgment for $37,935.86, consisting of $31,968.13 (the amount needed to satisfy the Johnson judgment), $3,817.73 (Villesvik's fees) and "consequential damages" of $2,150. Transamerica was granted subrogation rights in the Mason County judgment against W & A and Bowden for the total

amount of the judgment, but denied its claim for a transfer of the property.

## NATURE OF TITLE POLICY DUTIES
### OF TRANSAMERICA

██ ██ Any discussion of the issues raised by the parties must begin with an examination of the title policy itself.[1] Nowhere in the policy is there any mention of an obligation or duty of Transamerica to "clear title" for the insured. The policy does not purport to "guarantee" title. By the clear terms of the contract, Transamerica, in consideration for a fixed single premium, agrees that it will insure "against loss or damage sustained by reason of: . . . (2) Any defect in, or lien or encumbrance on, said title". In essence then, Transamerica agreed to indemnify, *i.e.,* hold harmless or reimburse Securities for any loss due to the *causes insured against* in an amount not exceeding policy limits of $27,000. Title policies of the kind issued by Transamerica in this case do not guarantee or insure a clear title or that there will be no losses. As stated in 1 W. Freedman, *Richards on Insurance* § 32 (5th ed. 1952) at pages 108–09:

> The contract is one of indemnity against defects in or unmarketability of title, or liens, or encumbrances. The risks of title insurance, although they may be referable to the contingency of future loss, are only designed to save the insured harmless from loss through defects in or unmarketability of title, or liens, or encumbrances, that may affect or burden his title when he takes it.
>
> . . .

---

[1]The insuring clause of the policy reads in part as follows:
"TRANSAMERICA TITLE INSURANCE COMPANY
"hereinafter called the Company, a California corporation, for valuable consideration, and subject to the conditions and stipulations of this policy, does hereby insure the person or persons named in item 1 of Schedule A, together with the persons and corporations included in the definition of 'the insured' as set forth in the conditions and stipulations, against loss or damage sustained by reason of:
". . .
"2. Any defect in, or lien or encumbrance on, said title existing at the date hereof, not shown in Schedule B;"

> *Since the contract is one of indemnity only, the insured must show actual loss sustained before recovery can be had.* The conditions of a policy of title insurance and the covenants of title contained in a deed are analogous in many respects, and in the absence of express words in the policy the same rules of damages would apply. The measure of damages in an action for the breach of a covenant of seizin is ordinarily the consideration paid by the grantee for the property; and the grantee need not wait until he has been evicted by superior title but may bring his action as soon as he discovers his grantor lacked title. This measure of damages is applied upon the theory, that since the grantor had no title he had none to convey, and the grantee, therefore, may recover the money paid without consideration. The covenant against encumbrance ordinarily contained in deeds is essentially more nearly like the agreement of a title policy. That covenant is one of indemnity and the measure of damages for its breach is such sum as will indemnify the grantee for the loss actually sustained.

(Footnotes omitted. Italics ours.) *See also Southern Title Guar. Co. v. Prendergast,* 478 S.W.2d 806 (Tex. Civ. App. 1972); *Grimsey v. Lawyers Title Ins. Corp.,* 38 App. Div. 2d 572, 328 N.Y.S.2d 474 (1971), *aff'd,* 31 N.Y.2d 953, 293 N.E.2d 249 (1972); 44 Am. Jur. 2d *Insurance* § 1450 (1969); 15 R. Anderson, *Couch on Insurance* § 57:179 (2d ed. 1966); 9 J. Appleman, *Insurance Law and Practice* § 5217 (1943, Supp. 1978); Pelkey, *The Law of Title Insurance,* 12 Marq. L. Rev. 38 (1927) and the cases collected therein at footnote 25, page 43. In view of the plain language of the policy it was improper for the trial court to rewrite the insurance contract so as to impose a broader duty to "clear title." *Cf. Tucker v. Bankers Life & Cas. Co.,* 67 Wn.2d 60, 406 P.2d 628, 23 A.L.R.3d 1098 (1965). Consequently, an award of damages in excess of the policy limits for a breach of such a nonexistent duty cannot stand.

### WHEN DAMAGES IN ADDITION TO POLICY LIMITS MAY BE RECOVERED

■ In a suit upon a policy of title insurance (indemnity), while the measure of recovery for actual losses due to

defects insured against may *never* exceed policy limits, *Waite v. Aetna Cas. & Sur. Co.*, 77 Wn.2d 850, 467 P.2d 847 (1970); Annot., 60 A.L.R.2d 1001 (1958), there are instances or circumstances in which damages *in addition to* policy limits may be assessed against the insurer. Such damages may be recovered when the insurer breaches a duty owed to the insured, such as by failing to assume a properly tendered defense, or by acting negligently or in bad faith after undertaking to defend. In *Quigley v. St. Paul Title Ins. & Trust Co.*, 60 Minn. 275, 62 N.W. 287 (1895), the trial court refused an offer by the insured to prove that his title company negligently failed to inform him the property had been sold after an unsuccessful defense against a lien, and that the period of redemption had expired. The language employed by the Minnesota Supreme Court highlights the distinction we make here when it states:

> It will be seen by an examination of the provisions in the body of the policy, above quoted, that the defendant agreed to indemnify, save harmless, and insure Quigley against loss from three different causes: (1) "Defects in the present title;" (2) "liens or incumbrances affecting the same at the date hereof;" (3) "any defect apparent of record in the execution or filing for record of said mortgage." Its liability for loss from these three causes is expressly limited to $2,200, and the insured has a right to recover that amount of loss arising from any or all of these three causes alone, and this fairly implies that, *if his loss arises from some other cause besides these three, this limitation does not cover it also.* In this case it is claimed that his loss does, at least in part, arise from some other cause, to wit, that of the negligence of defendant. Under said section or subdivision 1 of the stipulations and conditions attached to the policy, the defendant has the option to defend the suit, or pay the claim on which suit is brought, or pay the insured the amount of its liability under the policy. If it elects to defend the suit, it must be held to do so for its own benefit, and must exercise reasonable care; if it fails to do so, it is liable for any loss caused by such failure, and the limitation above quoted does not apply.

(Italics ours.) *Quigley v. St. Paul Title Ins. & Trust Co.,* *supra* at 283.

Securities argues that Transamerica should have settled with Johnson when it could have done so within the policy limits. This contention has no merit for two reasons. First, there is no evidence Johnson would have settled within policy limits. Second, and more importantly, Transamerica had no duty to clear title and consequently no duty to bargain or attempt settlement. As the trial judge aptly observed, the policy clearly gave Transamerica the *option* to settle adverse claims, pay its insured the policy limits or defend to judgment.[2] Although the court recognized that "the policy, however, is permissive, does not mandate that the carrier [pay the Johnson claim]," the trial court erred in penalizing Transamerica for exercising that option.

Securities next contends that the trial judge's finding that Transamerica was guilty of neither bad faith nor negligence is insupportable. We disagree. Transamerica promptly accepted Villesvik's tender and undertook to defend against the Johnson mortgage by retaining Mr. Ragan. The delays which ensued cannot be attributed to Transamerica. As we have noted, the attorneys were reluctant to accept the fact of Bowden's forgery until his admission in September 1974. Also, there was the matter of W & A's refusal to deny outright Johnson's allegations that Securities was no innocent purchaser but was somehow

---

[2]The conditions or stipulations of the policy include:

"1. The Company shall have the right to, and will, at its own expense, defend the insured with respect to all demands and legal proceedings founded upon a claim of title, encumbrance or defect which existed or is claimed to have existed prior to the date hereof and is not set forth or excepted herein; reserving, however, the option at any time of settling the claim or paying the amount of this policy in full.

"2. In the event of final judicial determination by a court of competent jurisdiction, under which the estate, lien or interest insured is defeated or impaired by reason of any adverse interest, lien or encumbrance not set forth or excepted herein, claim may be made as herein provided. A statement in writing of any loss or damage, for which it is claimed the Company is liable, shall be furnished to the Company at its state office within sixty days after such loss or damage shall have been ascertained."

involved in Bowden's fraudulent scheme. Nor do we see any breach of trust or duty in Transamerica's justifiable concern, either with the complicity charge or the protection of its subrogation rights. As to the former, if Securities was a party to the fraud the policy would be rendered null and void; as to the latter, Transamerica had a right to be concerned over the form of any judgment favoring Securities because of the apparent lack of financial responsibility of W & A and Bowden.

Lastly, Securities' argument that Transamerica acted in bad faith when it refused to accept settlement offers made by Villesvik after entry of the Johnson judgment has no merit. At all times there has been a genuine dispute over the extent of Securities' actual loss and the question of attorneys fees. Transamerica had no obligation to accept its insured's offers of settlement or its proofs of loss. Securities has cited us to no authority for such a proposition. The offers were irrelevant to any claim of bad faith.

### SECURITIES' ACTUAL LOSS

We turn now to the major issue on appeal, which is the proper measure of Securities' recovery. The policy terms clearly restrict Transamerica's liability to the insured's "actual loss" from defects of title, plus costs of defense and settlement.[3] Ordinarily, when the defect insured against takes the form of a lien or encumbrance, the owner's loss is measured by the amount of money required to remove the offending lien or encumbrance. *National Holding Co. v. Title Ins. & Trust Co.*, 45 Cal. App. 2d 215, 113

---

[3] A further condition or stipulation of the policy reads:

"3. The Company may at any time pay this policy in full, whereupon all liability of the Company shall terminate. Every payment made by the Company, exclusive of costs incurred by the Company as an incident to defense or settlement of claims hereunder, shall reduce the liability of the Company by the amount paid. The liability of the Company shall in no case exceed the actual loss of the insured and costs which the Company is obligated to pay. When the Company shall have paid a claim hereunder it shall be subrogated to all rights and remedies which the insured may have against any person or property with respect to such claim, or would have if this policy had not been issued, and the insured shall transfer all such rights to the Company."

P.2d 906 (1941); *Atlanta Title & Trust Co. v. Inman,* 42 Ga. App. 191, 155 S.E. 364 (1930); *Broadway Realty Co. v. Lawyers' Title Ins. & Trust Co.,* 226 N.Y. 335, 123 N.E. 754 (1919); 60 A.L.R.2d 969, 972 (1958). In *National Holding* and *Atlanta Title,* when the insurer's refusal to satisfy liens or assessments forced the owner to do so, he was held entitled to recover the costs, including attorneys fees, from his insurer. In *Broadway Realty* the insured recovered his actual costs of removing an encumbrance. In all three cases the losses did not exceed policy limits.

In the instant case Securities could have paid the Johnson claim at any time it became satisfied the mortgage release was a forgery. If it had done so to avoid increased costs and keep its loss from exceeding the policy limits, it would have been entitled to recover from Transamerica the amount paid, up to the policy limits. Of course, in that event, Securities would be required to prove it had paid a valid claim, *i.e.,* that the mortgage satisfaction was forged. Securities elected, however, not to pay the Johnson mortgage even after it was reduced to judgment; instead, it submitted to a sale of the property and permitted the statutory time to expire without redemption. We do not know if this election was motivated by a lack of funds or by an unwillingness to venture further sums in the property.

In any event, the amount which it might have taken at one time to pay the Johnson mortgage or discharge the judgment in no way reflects Securities' "actual loss," which we have held is all it can claim under the policy. Clearly the "actual loss" sustained by Securities because of the existence of the Johnson mortgage is the amount which it originally invested in the property, $23,625, plus interest at the legal rate of 6 percent per annum from August 9, 1971, to February 10, 1975, the date the judgment appealed from became final, less a net $4,462.50 received in contract payments. This is the true measure of what Securities is "out of pocket" on the transaction, because of the defect in title insured against.

### DEFENSE FEES AND COSTS

■ The general rule is that attorneys fees are recoverable by the insured if it is forced to conduct its own defense of title due to a breach by the insurer of its covenant to defend the title. *Paramount Properties Co. v. Transamerica Title Ins. Co.*, 1 Cal. 3d 562, 463 P.2d 746, 83 Cal. Rptr. 394 (1970); *Grimsey v. Lawyers Title Ins. Corp., supra; Baumann v. Puget Sound Title Ins. Co.*, 184 Wash. 9, 49 P.2d 914 (1935); Annot., 60 A.L.R.2d 972, 1001 (1958). Here, however, Transamerica did undertake the defense. The trial court found that the conversations between Villesvik and Transamerica's legal counsel contemplated that Transamerica would not assume any defense connected with the allegations of complicity in the fraud. This is clearly evidenced by the exchange of correspondence occurring shortly after the tender was made. The fact there was no written reservation of rights by Transamerica, as found by the trial court, does not change the result nor add to Transamerica's responsibilities. *Associated Indem. Corp. v. Wachsmith*, 2 Wn.2d 679, 99 P.2d 420, 127 A.L.R. 531 (1940).

Transamerica did, in fact, retain Mr. Ragan, and while his services might have been "minimal"—as they were characterized by the trial court—they were solely addressed to defending against the Johnson mortgage. Ragan's work consisted, in the main, of attempts to determine if the mortgage satisfaction was indeed a forgery. Once this fact was established, he was instructed to protect Transamerica's subrogation rights by insuring that the Mason County judgment would constitute a nondischargeable debt in bankruptcy. He also cross-examined Johnson regarding the amount due on the mortgage during the formal offer of proof for the default judgment. That his efforts were "minimal," as compared to Villesvik's, is hardly surprising. Villesvik's allegiance was to his client, Securities, against whom serious charges had been leveled, and his billings reflect that his efforts were devoted primarily to resisting the complicity charge, seeking relief over against W & A

and Bowden, and obtaining a forfeiture of the Shephard contract.[4]

The trial judge concluded that Transamerica was liable for Villesvik's fees because it "controlled" the litigation, *i.e.,* did not clear title and insisted the matter go to judgment. She also concluded that Villesvik's services were made necessary by the "defect in the title." These conclusions stem from her original misconstruction of the title policy and Transamerica's duties under it. Clearly, the efforts exerted by Villesvik and the expenses incurred by him were directly and proximately caused by Bowden's forgery and Johnson's charges of complicity. These expenses do not flow from the "defect" in title, which was the valid Johnson mortgage. Judgment for Villesvik's fees should not have been entered against Transamerica.

### TRANSAMERICA'S SUBROGATION RIGHTS

Transamerica argues that upon payment of Securities' loss, it is entitled to a conveyance of the Johnson parcel under the subrogation language in its policy. Because the property has long since passed from the control of the insured, we need not discuss the dubious merits of this contention. That portion of the trial court's judgment which grants Transamerica subrogation rights in the Mason County judgment in favor of Securities against the other defendants will be affirmed except as the amount is modified herein, thus preserving to Transamerica the subrogation rights guaranteed to it by its policy.

### ATTORNEYS FEES—PRESENT ACTION

Finally, Securities contends on cross appeal that the court erred in refusing to award further "damages" against Transamerica in the nature of attorneys fees and costs incurred in prosecuting this action against Transamerica. Securities relies on a tort theory of negligence and bad faith

---

[4]In the face of the conflict of interest which thus arose, it is questionable whether Villesvik, even with the permission of the insurer, could properly represent both interests. *Waite v. Aetna Cas. & Sur. Co.,* 77 Wn.2d 850, 467 P.2d 847 (1970); *Van Dyke v. White,* 55 Wn.2d 601, 349 P.2d 430 (1960).

on the part of Transamerica in failing to pay the Johnson claim in a timely manner, thereby allegedly requiring Securities to file suit. In the absence of bad faith, the trial court had authority to award attorneys fees as part of the litigation only if authorized by statute or contract. *Hsu Ying Li v. Tang,* 87 Wn.2d 796, 557 P.2d 342 (1976); *Fritz v. Gorton,* 83 Wn.2d 275, 517 P.2d 911 (1974). Securities points to no statute or contractual provision allowing these fees.

The judgment is affirmed as modified.

PEARSON, C.J., and SOULE, J., concur.

Petition for rehearing denied August 7, 1978.

Review denied by Supreme Court December 14, 1978.